**Brian VINSON, Plaintiff–Appellant,**

**United States of America, Intervenor,**

**v.**

**Alice THOMAS, individually and in her capacity as the Director of the Vocational Rehabilitation Branch of the Department of Labor and Industrial Relations, State of Hawaii; Department of Labor and Industrial Relations, State of Hawaii; Intracorp, a duly organized and incorporated Delaware corporation, Defendants–Appellees.**

No. 00–15534.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 2001

Filed May 3, 2002.

**1148**

Michael K. Livingston, Honolulu, HI, for the plaintiff-appellant.

J. Gerard Lam, Deputy Attorney General, Honolulu, HI, and Michael W. Kirk, Washington, DC, for defendants-appellees Department of Labor and Industrial Relations, State of Hawaii and Alice Thomas.

Seth M. Galanter, United States Department of Justice, Washington, DC, for intervenor United States of America.

Before: THOMPSON, O'SCANNLAIN, and BERZON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge.

Brian Vinson ("Vinson") filed suit against Alice Thomas ("Thomas") and the State of Hawaii Department of Labor and Industrial Relations ("DLIR") (collectively "the defendants") claiming they denied him vocational rehabilitation services in violation of his rights under Title II of the ADA and section 504 of the Rehabilitation Act. The district court granted summary judgment in favor of the defendants. Vinson appeals.

Consistent with our recent decision in *Douglas v. California Department of Youth Authority,* 271 F.3d 812, *as amended,* 271 F.3d 910 (9th Cir.2001), we hold that by its acceptance of federal Rehabilitation Act funds, the State waived its Eleventh Amendment immunity as to Vinson's claim under section 504 of the Rehabilitation Act. We also conclude that genuine issues of material fact exist which preclude summary judgment on that claim. Thus, we reverse the district court's summary judgment in favor of the DLIR on Vinson's Rehabilitation Act claim.[1]

Vinson's claims against the individual defendant, Thomas, were asserted under 42 U.S.C. § 1983. The only § 1983 claim preserved in this appeal is the claim that, acting in her individual capacity, Thomas violated Vinson's federal rights under the ADA and the Rehabilitation Act. We conclude Vinson may not pursue a section 1983 claim against Thomas in her individual capacity for her alleged violation of either the ADA or the Rehabilitation Act, and thus we affirm the district court's summary judgment in favor of Thomas.

**I**

In August 1993, Vinson injured his neck and back while working for a flooring company. He received workers' compensation benefits, including vocational rehabilitation benefits paid for by his employer's workers' compensation carrier. The insurance carrier contracted with Intracorp, a private contractor, to develop and manage a vocational rehabilitation plan for Vinson.

---

**1.** At oral argument, Vinson waived any separate claim against the DLIR under Title II of the ADA, content to rely on analogous rights and remedies under section 504 of the Rehabilitation Act.

Intracorp referred Vinson to rehabilitation specialist, Barbara Boddy, for evaluation.

Vinson told Boddy that he had dyslexia. Boddy adjusted her testing to accommodate Vinson's self-reported dyslexia by giving him both the General Aptitude Test Battery (GATB) and Non Reading Aptitude Test Battery (NATB). After this testing, Boddy believed that a two-year college program would be an important element of Vinson's vocational rehabilitation, and that he could succeed in such a program so long as he received "some special assistance such as a note taker, tape recorder, or consideration for extra time on tests." Boddy further indicated that it might take Vinson "longer than average" to complete a two-year college program and that Vinson would "have to be a very serious and dedicated student to accomplish his goal."

In the spring of 1995, Vinson enrolled at Honolulu Community College ("the college") where he attended classes through the summer of 1996. Vinson took only 9 units per semester, rather than the customary 12. Nonetheless, the college considered him to be a full-time student because of his long-standing history of a learning disability. Throughout this period, his employer's workers' compensation carrier, under no obligation to do so, voluntarily paid for Vinson's schooling as part of his vocational rehabilitation.

In April 1996, Intracorp sought approval from the DLIR of a State-funded rehabilitation plan for Vinson that would provide him with a two-year community college education with accommodations for his dyslexia, including a reduced courseload and

the use of computer hardware and software. Initially, DLIR representatives told Intracorp that Vinson had to take at least 12 units per semester, which the college considered full-time. Although he preferred to take only 9 units per semester, Vinson indicated he would be willing to attempt 12 units so long as the State provided him with appropriate computer hardware and software for persons with dyslexia.[2]

Soon thereafter, Alice Thomas, the vocational rehabilitation supervisor at the DLIR, decided that Vinson should take not just 12, but 15 units per semester so that he would complete the college program sooner. She also stated that he had to demonstrate he could meet "competitive standards," as measured by a 15 credit courseload, so that the DLIR would be assured that he could work and compete in an average labor market once his schooling was completed.[3]

At this point, Vinson's workers' compensation attorney got involved. He sent a letter to Intracorp and to Alice Thomas at the DLIR formally requesting that Vinson be permitted to take 9 units per semester and be provided with an appropriate computer. Thomas, however, remained of the view that Vinson required neither a reduced courseload nor a special computer. She also was not persuaded that he suffered from dyslexia. Thus, by letter dated July 12, 1996, Thomas asked Vinson's attorney to submit "any and all medical information (to include but not limited to diagnoses and limitations) regarding [Vinson's] unrelated disability."[4]

2. Vinson's expert recommended that he be provided with a laptop computer equipped with voice recognition software, to assist him in taking notes and preparing assignments.

3. Thomas arrived at her figure of 15 units per semester by dividing the total units required to complete the A.S. degree sought by Vinson

(60 units), by the total number of semesters ordinarily taken to complete the degree (4 semesters).

4. Apparently "unrelated" referred to the fact that Vinson's dyslexia was unrelated to his workplace injury.

On July 25, 1996, Vinson's attorney responded with a letter which included the following attachments: (1) a July 8, 1996 letter from the college indicating that Vinson had a long-standing history of a learning disability, that the college recognized him as a full-time student with nine credits on account of his disability, and that he required a reduced course load in order to continue to progress in his studies; (2) a March 20, 1996 letter from Learning Disability Specialist Lynne Douglas at Leeward Community College stating that upon review of Vinson's past history and existing diagnostic documents Vinson could benefit from computer based programs; and (3) a March 7, 1996 letter from the college noting that Vinson had a "long-standing learning disability, Dyslexia," and recommending that he be permitted to take a reduced courseload and be provided with computer hardware and software.

Thomas responded by letter on July 26, 1996 clarifying that she needed the following documentation regarding Vinson's claim of disability:

1. Verifiable, medical/psychological evidence establishing a disability exists (diagnosis, test scores, etc.,)
2. Specific physical/psychological limitations (medically established) experienced by *your claimant.*
3. The credentials and reports of the experts referred to in your previous correspondence who, based on said limitations, identified appropriate accommodations. (Emphasis in original.)

On July 30, 1996, Vinson's attorney sent Thomas another letter stating that he would try to provide the information requested, but that the diagnostic "evidence" sought by the DLIR probably did not exist. On August 2, 1996, Thomas responded by letter stating that the only evidence in the program file that Vinson had dyslexia was his own self-report. She further clarified her request for information:

> For guidance as to what evidence is needed the *Diagnostic and Statistical Manual* addresses diagnostic criteria. Providing us with diagnosis, psychological/physical limitations, and current medical status (defined as stability of limitations) may allow us to identify reasonable accommodations at HAR 12–14–5(a)(4) or at least clarify the need to revisit HAR 12–14–5(a)(3).

> For the record, your claimant's request to take nine credits a semester rather than meet the competitive standard of fifteen, would represent a 75% increase in plan duration.

Thomas placed Vinson's rehabilitation case in suspended/interrupted status for 60 days to allow him time to submit the additional information requested.

On September 26, 1996, shortly before the 60 day suspension was to expire, the learning disability specialist, Lynne Douglas, sent Gina Eustaquio, the Intracorp disability specialist who was managing Vinson's vocational rehabilitation plan, a summary report that contained extensive information regarding Vinson's diagnostic, academic, and behavioral history, his vocational rehabilitation testing, his progress at the college, and his current status. Attached to Douglas's report was a one-page Individualized Education Program Plan for Vinson dated June 12, 1979, showing that he had been placed in full-time learning disability classes in elementary school as a result of "psychological and educational data." Douglas noted that Vinson had been diagnosed with a learning disability early in his schooling, and had been served as a person with a learning disability throughout his education.

Based upon Douglas's report, and considering the accommodations provided to Vinson by the college, Ms. Eustaquio be-

lieved a sufficient diagnosis of dyslexia had been made to warrant consideration of reasonable accommodations by the DLIR. Eustaquio telephoned Thomas and read Douglas's report to her. Without seeing the report, Thomas concluded that it was insufficient because it did not have specific diagnosis and limitation information. In particular, Thomas believed the report did not contain sufficiently specific information regarding "why [Vinson] could not complete more than nine credits at a time in terms of reading, how much could he read per day, and, you know, exactly why couldn't he read more than so much information per day."

Because Vinson had failed to provide what Thomas considered to be sufficient information to support his asserted disability, she instructed Eustaquio to prepare a closure report. Thomas also stated that even if Vinson were to attempt to carry 15 units per semester (which he was willing to try), she would still not approve a rehabilitation plan for him, because he had submitted evidence that due to his asserted dyslexia he could only handle 9 units per semester. Thomas refused any further extensions of time to explore alternatives. Thus, Vinson's case was closed as "not feasible" and his request for State-funded rehabilitation schooling was denied.

Vinson then filed suit under Title II of the ADA and section 504 of the Rehabilitation Act.[5] He alleged that Thomas and the DLIR discriminated against him by denying his request for vocational rehabilitation schooling benefits without making reasonable accommodations for his dyslexia. After Vinson filed his lawsuit, the DLIR reopened his case and he was granted vocational rehabilitation benefits, including schooling at his requested pace of study.

Vinson, however, continues to seek monetary damages from the DLIR and Thomas for what he alleges to be severe emotional distress suffered as a result of their earlier refusal to approve a rehabilitation plan that would include accommodations for his dyslexia.

The district court granted summary judgment in favor of the DLIR and Thomas. Vinson timely appealed. We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand for further proceedings.

## II

We first address the DLIR's contention that it is protected from suit on Vinson's Rehabilitation Act claim by sovereign immunity under the Eleventh Amendment. This argument is foreclosed by our recent decision in *Douglas*. In that case, we reaffirmed, following the Supreme Court's decision in *Board of Trustees v. Garrett*, 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), our previous holding in *Clark v. California*, 123 F.3d 1267, 1271 (9th Cir.1997), that States are subject to suit in federal court under section 504 of the Rehabilitation Act if they accept federal Rehabilitation Act funds. The State of Hawaii accepted federal Rehabilitation Act funds. Therefore, the Eleventh Amendment is not a bar to Vinson's section 504 claim against the DLIR. *See Douglas*, 271 F.3d at 820–21. We turn now to the merits of that claim.

## III

We review a grant of summary judgment de novo. *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th

---

5. Vinson also raised a claim under 42 U.S.C. § 1983 for the alleged violation of his procedural and substantive due process rights under the Fourteenth Amendment and a claim

under Hawaii Revised Statutes Chapter 386. The district court dismissed these claims, and Vinson does not challenge that dismissal in this appeal.

**1152**

Cir.2001). Summary judgment is appropriate only if, viewing the evidence in the light most favorable to the nonmoving party, there is no dispute as to any genuine issue of material fact. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir.1996).

 Vinson argues that the DLIR discriminated against him by refusing to approve (or consider in good faith) a rehabilitation plan that included reasonable accommodations for his dyslexia. He contends he is disabled according to 28 C.F.R. § 35.104 and 29 C.F.R. § 1615.103 as a person with an impairment (dyslexia) which substantially limits the major life activity of learning. The district court did not determine whether Vinson was *disabled* as a result of his dyslexia. Instead, the court determined that the DLIR was entitled to require Vinson to submit a diagnosis of dyslexia from a qualified medical professional, and he had not done so. Because he had not, the district court determined that Vinson had not provided the DLIR with sufficient proof that he suffered from dyslexia, the alleged impairment upon which his claim depended. The district court also determined that Vinson's requested vocational rehabilitation services had been denied for reasons other than his asserted disability.

 Whether Vinson met the statutorily defined requirements to establish that he was disabled under the Rehabilitation Act requires a fact specific inquiry into (1) whether he suffered from dyslexia, and if

so (2) whether his dyslexia was an impairment[6] under the Act, and if it was (3) whether a major life activity was substantially limited by that impairment. *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).[7]

Vinson did not provide a medical professional's diagnosis of dyslexia. He did provide, however, a sworn statement from his learning disabilities expert, Barbara Bateman, Ph.D., J.D.,[8] that the DLIR "was not entitled to demand or rely solely upon a 'medical' diagnosis of dyslexia, because dyslexia is diagnosed primarily by behavioral and/or psycho-educational data, as clearly shown in DSM–IV. It can be diagnosed by medical and non-medical personnel alike." Dr. Bateman's statement set forth the following diagnostic criteria for dyslexia from the *Diagnostic and Statistical Manual of Mental Disorders:*

(A) reading achievement, as measured by individually administered standardized tests of reading accuracy or comprehension, is substantially below that expected given the person's chronological age, measured intelligence; (B) the disturbance in Criterion A significantly interferes with academic achievement or activities of daily living that require reading skills; and (C) if a sensory deficit is present, the reading difficulties are in excess of those usually associated with it.

Dr. Bateman reviewed Lynne Douglas's September 26, 1996 letter and found that it

6. Mental and physical impairments are defined to include "specific learning disabilities." 28 C.F.R. § 35.104.

7. We examine cases construing claims under the ADA, as well as section 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts. *Zukle v. Regents of the University of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir.1999).

8. The defendants objected to Bateman's declaration based upon a failure to timely disclose her report according to the court's scheduling order. The district court did not rule on the defendants' objections, and did not strike the declaration from the record. Therefore, it is a part of the record before us.

contained "more than ample observational and anecdotal data to establish dyslexia." In addition, Vinson provided letters from the college indicating that it had provided accommodation to him because of his long standing history of a learning disability, and that it recognized him as a full-time student with nine credits on account of that disability. He also provided Douglas's September 26, 1996 letter noting his diagnostic and academic history, including his history of receiving accommodation as a person with a disability throughout his schooling, and Douglas's opinion that the accommodations he sought were reasonable.

Vinson also presented evidence that his dyslexia substantially limited a major life activity—learning. *See* 28 C.F.R. § 35.104 (2001) (defining "major life activity" to include learning). He provided:

A letter from the college indicating that because of his dyslexia he required extra study time;

Douglas's letter citing the GATB and NATB testing data from rehabilitation specialist Barbara Boddy, which Douglas believed demonstrated significant discrepancies between Vinson's performance on the written and non-written tests in the areas of spelling, language, and numerical abilities;

Douglas's letter showing an historical disparity in Vinson's testing data, his need to "read things over several times to comprehend what he is reading," and his need for a substantial amount of extra time to complete exams; and

Excerpts from the Intake Questionnaire completed by Vinson for Douglas, showing significant writing and spelling deficiencies.

Based upon all of the foregoing evidence which was presented to the district court, we conclude genuine issues of material fact exist as to whether Vinson has dyslexia and whether, if he does, his dyslexia is an impairment that substantially limits his ability to learn. Summary judgment was inappropriate on these disability issues. *See Mustafa v. Clark Co. Sch. Dist.,* 157 F.3d 1169, 1175 (9th Cir.1998) (determining that genuine issue of material fact precluded summary judgment as to whether plaintiff was disabled). We next consider the issue addressed by the district court: Whether Vinson provided to the DLIR sufficient documentation of his disability.

■ A public agency may require reasonable evidence of a disability before providing accommodations. *See Weinreich v. Los Angeles County Metro. Transp. Auth.,* 114 F.3d 976, 979 (9th Cir.1997) (public agency may require updated certification of qualifying disability). In refusing Vinson's requested accommodations, the DLIR relied not on the absence of any proof that he was disabled by dyslexia, but on Vinson's failure to provide a certain *kind* of proof of dyslexia. A public agency may not, however, insist on data supporting a claim of disability beyond that which would satisfy a reasonable expert in the field. *CF. Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 674 (1st Cir.1995) ("Where an applicant requests reasonable accommodation, an employer may request 'documentation from an appropriate professional (e.g., a doctor, rehabilitation counselor, etc.), stating that s/he has a disability.' ") (quoting Equal Employment Opportunity Comm'n, *Enforcement Guidance: Preemployment Disability–Related Inquiries and Medical Examinations Under the Americans with Disabilities Act of 1990* § IV.B.6.b (EEOC Notice 915.002) (May 19, 1994)). As there was a conflict of material fact on the question of whether a reasonable expert in the field would accept the type of evidence presented by Vinson as proof of his disability, the district court

should not have entered summary judgment on that issue.

■ Because there is a genuine issue of material fact as to whether Vinson is disabled within the meaning of the Rehabilitation Act, and whether he sufficiently demonstrated such disability to the DLIR, the next question we consider is: Assuming Vinson is disabled, did the DLIR fail to provide a reasonable accommodation for his disability? The parties did not raise the reasonable accommodation issue in the district court, and that court did not consider the issue because it concluded Vinson had not submitted to the DLIR sufficient evidence that he was disabled.[9] On remand, however, the district court will encounter the reasonable accommodation issue. Therefore, we address the issue in this opinion.

■ A failure to provide reasonable accommodation can constitute discrimination under section 504 of the Rehabilitation Act.

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7) (2001).

■ The question whether a particular accommodation is reasonable "depends on the individual circumstances of each case" and "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *Wong v. Regents of the Univ. of Cal.,* 192 F.3d 807, 818 (9th Cir.1999). Vinson bore the initial burden of producing evidence that a reasonable accommodation was possible. *Wong,* 192 F.3d at 816–17. Thereafter, the burden shifted to the DLIR to produce rebuttal evidence that the requested accommodation was not reasonable. *Id.* at 817.

■ If Vinson is disabled, the DLIR also had a duty to engage in an interactive process to consider his requested accommodations. As we have explained in the context of our employment cases, once the need for accommodation has been established, there is a mandatory obligation to engage in an informal interactive process "to clarify what the individual needs and identify the appropriate accommodation." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1112 (9th Cir.2000) (quoting *EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act,* EEO Compliance Manual (CCH), § 902, No. 915.002 (March 1, 1999), at 5440). This interactive process is triggered upon notification of the disability and the desire for accommodation. *Barnett,* 228 F.3d at 1114. An employer who fails to engage in such an interactive process in good faith may incur liability "if a reasonable accommodation would have been possible." *Id.* at 1116.

■ Because the district court determined that Vinson failed to establish that he is disabled, it did not consider whether the DLIR had engaged in an interactive process in good faith, whether Vinson's requested accommodations were reasonable, whether the proposed accommoda-

---

**9.** The district court also determined that Vinson had failed to show that the requested vocational rehabilitation services were denied solely because of his disability. Vinson's claim that the DLIR failed to modify its policies to reasonably accommodate his dyslexia, however, does not require such a showing. *See Humphrey v. Memorial Hospitals Ass'n,* 239 F.3d 1128, 1139 (9th Cir.2001).

tions would substantially alter the nature of the vocational rehabilitation services provided by the DLIR, or whether Vinson was otherwise qualified to complete the type of vocational rehabilitation plan suggested even with the accommodations.[10] *See Humphrey,* 239 F.3d at 1138–39; *Wong,* 192 F.3d at 816–17. As with the issue of Vinson's disability, the record reflects genuine issues of material fact concerning these additional issues. Thus, summary judgment was inappropriate on Vinson's claims that the DLIR failed to engage in good faith in the required interactive process and failed to reasonably accommodate his disability.

## IV

In addition to suing the DLIR, Vinson sued Thomas under 42 U.S.C. § 1983, in both her individual and official capacities. The district court determined that neither the DLIR nor Thomas in her official capacity were proper defendants under 42 U.S.C. § 1983. Vinson does not appeal that decision. Therefore, we address only the propriety of Vinson's § 1983 claim against Thomas in her individual capacity. As to that claim, the federal laws Vinson alleges Thomas violated are Title II of the ADA and section 504 of the Rehabilitation Act.[11]

Section 1983 does not confer rights, but instead allows individuals to enforce rights contained in the United States Constitution and defined by federal law. *See Buckley v. City of Redding,* 66 F.3d 188, 190 (9th Cir.1995). An alleged violation of federal law may not be vindicated under § 1983, however, where: "(1) the statute does not create an enforceable right, privilege, or immunity, or (2) Congress has foreclosed citizen enforcement in the enactment itself, either explicitly, or implicitly by imbuing it with its own comprehensive remedial scheme." *Buckley,* 66 F.3d at 190 (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)). "[A] comprehensive remedial scheme for the enforcement of a statutory right creates a presumption that Congress intended to foreclose resort to more general remedial schemes to vindicate that right." *Lollar v. Baker,* 196 F.3d 603, 609 (5th Cir.1999) (citing *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)).

We have not heretofore considered whether a public official can be sued in his or her individual capacity under 42 U.S.C. § 1983 predicated upon alleged violations of the ADA or the Rehabilitation Act.[12]

10. Vinson also bears the initial burden of demonstrating that, with reasonable accommodations, he is otherwise qualified to participate in the DLIR's vocational rehabilitation services. *Wong,* 192 F.3d at 816–17. The DLIR never disputed that Vinson was "otherwise qualified" to receive vocational rehabilitation services. To the contrary, the record demonstrates that until Thomas insisted that Vinson carry a course load of at least 15 credits per semester, all of the parties proceeded for more than two years on the assumption that Vinson was intellectually and academically capable of completing the community college program so long as he received some accommodation.

11. Vinson's individual capacity claim against Thomas does not implicate the State's sover-

eign immunity under either the ADA or the Rehabilitation Act.

12. In *Duvall v. County of Kitsap,* 260 F.3d 1124 (9th Cir.2001) the plaintiff sued the County of Kitsap under the ADA and Rehabilitation Act and under 42 U.S.C. § 1983. We noted: "On appeal, the only issue pertinent to this provision raised by any of the defendants is whether Duvall has shown that the denial of his request for videotext display resulted from a custom or policy of the County." *Id.* at 1141. The question whether § 1983 could be used as a mechanism to recover for violation of the ADA or the Rehabilitation Act was not addressed.

Other circuits that have addressed this question have held that an individual cannot be sued under section 1983 for violations of Title II of the ADA or section 504 of the Rehabilitation Act.

In *Alsbrook v. City of Maumelle*, 184 F.3d 999 (8th Cir.1999) (en banc), the Eighth Circuit determined that the comprehensive remedial scheme of Title II of the ADA barred a section 1983 action against defendants in their individual capacities predicated upon a Title II violation. *Id.* at 1011. The Fifth Circuit came to a similar conclusion in a case involving the Rehabilitation Act. In *Lollar*, 196 F.3d at 610, the Fifth Circuit held that that Act "provided a specific comprehensive internal enforcement mechanism to protect the rights of the disabled who are employed by recipients of federal funds" and that "Congress intended to foreclose resort to the more general enforcement provisions of section 1983 to vindicate the rights created by the Rehabilitation Act." *Id.* at 609–610. The Eleventh Circuit, in *Holbrook v. City of Alpharetta*, 112 F.3d 1522 (11th Cir. 1997), applied the same analysis and held that a plaintiff could not "maintain a section 1983 action in lieu of—or in addition to—a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the employee's rights created by the Rehabilitation Act and the ADA." *Id.* at 1531.

■ We find the reasoning of our sister circuits persuasive. We therefore join the Fifth, Eighth, and Eleventh Circuits and hold that a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act. Vinson's claim against Thomas in her individual capacity under 42 U.S.C. § 1983 fails.[13]

## V

In sum, we conclude that, by accepting federal Rehabilitation Act funds, the DLIR waived its Eleventh Amendment immunity as to Vinson's claim under section 504 of the Rehabilitation Act. That claim, therefore, is not precluded by the DLIR's sovereign immunity. Vinson has raised genuine issues of material fact on the questions whether he was disabled, whether he presented sufficient evidence of his disability to the DLIR, whether the DLIR failed to engage in good faith in the required interactive process, and whether the DLIR wrongfully refused his request for reasonable accommodation. The district court's summary judgment in favor of the DLIR on Vinson's claim under section 504 of the Rehabilitation Act is reversed.

■ Vinson may not proceed against Thomas in her individual capacity on his claim under 42 U.S.C. § 1983, predicated upon her alleged violation of Title II of the ADA and section 504 of the Rehabilitation Act, because that claim is barred by the comprehensive remedial scheme of those Acts. The district court's summary judgment in favor of Thomas in her individual capacity on that claim is affirmed.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

O'SCANNLAIN, Circuit Judge, dissenting:

I respectfully dissent from Part III of the majority's determination that Brian Vinson's claim of disability discrimination against Hawai'i should survive summary judgment. Indeed, if I were writing on a clean slate, I would not even reach the merits of his claim because I believe Ha-

---

**13.** The district court granted summary judgment in favor of Thomas in Vinson's § 1983 action on the ground that she was entitled to qualified immunity. We do not reach the qualified immunity issue.

wai'i enjoys a constitutionally protected right of sovereign immunity from these suits that was neither waived nor validly abrogated by Congress.

I

For over a century, the Supreme Court has taught us that federal jurisdiction over suits against unconsenting States "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Indeed, the Eleventh Amendment's "ultimate guarantee" is "that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). We have seen the Supreme Court strike down statutes passed pursuant to Congress's Article I power that purported to abrogate state sovereign immunity, *Seminole Tribe of Fla. v. Fla.,* 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996); *see also Alden v. Maine,* 527 U.S. 706, 759–60, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999) (holding that Article I does not permit Congress to subject nonconsenting States to private suits in their own courts), limit the reach of Congress's power to enforce against the States the rights guaranteed by the Fourteenth Amendment, *Garrett,* 531 U.S. at 374, 121 S.Ct. 955 (holding Title I of the ADA did not validly abrogate sovereign immunity); *Kimel v. Fla. Bd. of Regents,* 528 U.S. 62, 91, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (holding that the Age Discrimination in Employment Act did not validly abrogate sovereign immunity); *United States v. Morrison,* 529 U.S. 598, 625–26, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (holding that Congress lacked the authority to create the civil remedy provision of the Violence Against Women Act), and allow States to participate in a field subject to congressional regulation without waiving their constitutionally guaranteed

sovereign immunity, *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 680, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). It cannot be more clear that the States retain "a residuary and inviolable sovereignty. They are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty." *Alden,* 527 U.S. at 715, 119 S.Ct. 2240 (internal citation and quotations marks omitted).

A

I recognize, however, that we have recently reaffirmed that by accepting federal funds under the Rehabilitation Act, 29 U.S.C. § 794, a State waives its sovereign immunity from suits by individuals in federal court. *Douglas v. Cal. Dep't of Youth Auth.,* 271 F.3d 812, *as amended,* 271 F.3d 910 (9th Cir.2001); *see also Armstrong v. Davis,* 275 F.3d 849, 878 (9th Cir.2001); *Clark v. Cal.,* 123 F.3d 1267 (9th Cir.1997). My dissent from the order denying *Douglas* en banc rehearing fully explains my disagreement with our approach to the question of sovereign immunity waiver. *Douglas v. Cal. Dep't of Youth Auth.,* No. 99–17140, 2002 WL 538806 (9th Cir. April 12, 2002) (O'Scannlain, J., dissenting); *see also Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98 (2d Cir.2001). I will not belabor the point here, but reluctantly acquiesce in Part II of the opinion.

B

Vinson waived reliance on Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* at oral argument. While I agree that this was a wise choice considering the clear holding and import of *Garrett,* 531 U.S. at 374, 121 S.Ct. 955 (holding Title I of the ADA did not validly abrogate state sovereign immu-

nity),[1] we have recently upheld Title II as a valid abrogation of state sovereign immunity. *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1171 (9th Cir.2002); *see also Dare v. Cal.*, 191 F.3d 1167, 1175 (9th Cir.1999), *cert. denied*, 531 U.S. 1190, 121 S.Ct. 1187, 149 L.Ed.2d 103 (2001).

Since Title II is no longer an issue in Vinson's appeal, I simply note that *Hason's* holding conflicts with no fewer than five of our sister circuits who have reconsidered the issue in light of *Garrett. See Reickenbacker v. Foster*, 274 F.3d 974, 983 (5th Cir.2001); *Thompson v. Colorado*, 278 F.3d 1020, 1034 (10th Cir.2001), *petition for cert. filed*, 70 U.S.L.W. 3464 (U.S. Jan. 7, 2002) (No. 01–1024); *Erickson v. Bd. of Governors of State Colleges and Univ.*, 207 F.3d 945, 948 (7th Cir.2000) (questioning the continued authority of *Crawford v. Ind. Dep't of Corrections*, 115 F.3d 481, 487 (7th Cir.1997), which upheld Title II as a valid abrogation of state sovereign immunity), *cert. denied*, 531 U.S. 1190, 121 S.Ct. 1187, 149 L.Ed.2d 104 (2001); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1009–10 (8th Cir.1999) (en banc); *cf. Brown v. N.C. Div. of Motor Vehicles*, 166 F.3d 698, 707 (4th Cir.1999) (holding regulation enacted pursuant to Title II did not validly abrogate state sovereign immunity); *but see Garcia*, 280 F.3d at 111–12 (holding that Title II actions may be brought against States if the plaintiff can establish that the "violation was motivated by discriminatory animus or ill will based on the plaintiff's disability"); *but cf. Po-*

*povich v. Cuyahoga County Court of Common Pleas*, 276 F.3d 808, 812, 815 (6th Cir.2002) (en banc) (agreeing that Title II is *not* a valid abrogation of sovereign immunity when Congress is enforcing the Equal Protection Clause, but holding it *is* permissible when enforcing the Due Process Clause).[2]

## II

Of course, if Hawai'i's sovereign immunity prevents it from being haled into federal court for an alleged violation of the ADA or Rehabilitation Act, we would have no occasion to reach the merits of Vinson's claim. Accepting the majority's recital of our current law of sovereign immunity in Part II, however, the majority still errs in Part III by reversing the district court's grant of summary judgment.

## A

To qualify as a disabled individual under the Rehabilitation Act, Vinson must establish that he has an impairment that substantially limits at least one of his major life activities. 42 U.S.C. § 12102(2); 29 U.S.C. § 791(g).[3] Certainly dyslexia can constitute an "impairment," 29 C.F.R. § 1630.2(h)(2) (defining impairment to include "specific learning disabilities"); however, I am not persuaded that Vinson presented evidence sufficient to survive summary judgment on whether he had an impairment—particularly one that substantially limited a major life activity.

While interpretative regulations include "learning" as a major life activity, 29 C.F.R. § 1630.2(i),[4] Vinson must demon-

1. Title I prohibits employment discrimination against qualified individuals on the basis of their disability, 42 U.S.C. § 12112, and Title II prohibits discrimination in the provision of public services and programs, 42 U.S.C. § 12132.

2. *Garrett's* reasoning regarding the ADA undoubtedly invalidates the Rehabilitation Act's attempt to abrogate sovereign immunity as well. *See Reickenbacker*, 274 F.3d at 983 ("Since the two statutes offer virtually identi-

cal protections, the abrogation analysis is the same."); *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 n. 11 (9th Cir.1999).

3. Vinson does not argue that he has either a record of an impairment or was regarded as having an impairment.

4. Because Congress gave no agency the authority to issue regulations implementing generally applicable provisions of the ADA-particularly the authority to interpret the term

strate that his dyslexia *substantially limits* his ability to learn. The phrase "substantially limits" requires that "a person be *presently*—not potentially or hypothetically—substantially limited in order to demonstrate a disability." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (emphasis added). This is an individualized inquiry. *Id.* at 483, 119 S.Ct. 2139. More specifically, "substantially limited" refers to the inability to perform a major life activity as compared to the average person in the general population, or a significant restriction as to the condition, manner, or duration under which an individual can perform the particular activity. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 690, 151 L.Ed.2d 615 (2002) (citing 29 C.F.R. § 1630.2(j)).

In short, dyslexia does not render an individual disabled per se for purposes of the Rehabilitation Act.

### B

It is not enough for Vinson to establish post hoc that he has an impairment that substantially limits the major life activity of learning. Rather, because his suit is based upon the Department of Labor and Industrial Relations's ("the Department") initial failure to accommodate his disability, he must establish that he presented sufficient proof of his disability to the Department. Indeed, a public entity does not violate the law by refusing to accommodate individuals who cannot establish that they have disability that qualifies them for an accommodation.

Thus, it is important to focus on the information that the Department—particularly Alice Thomas, Director of the Vocational Rehabilitation Branch—had *at the time* it decided to close Vinson's file in

October 1996. For that reason, the sworn statement of Vinson's learning disabilities expert, Barbara Bateman, cited by the majority, *supra* at ——, is immaterial to the question of what the Department knew; she prepared her statement well after the department closed Vinson's file. The Department did have a September 26, 1996 letter from C. Lynne Douglas, a learning disability specialist, that Vinson argues is the definitive letter that should have satisfied the Department that his dyslexia substantially limited his ability to learn.

However, Douglas herself admitted that her letter was not meant to be a diagnostic report. When asked in her deposition whether her letter was a "diagnosis of a learning disability," she replied, "It was not, and it was never intended to be one." Indeed, she did not complete her diagnostic tests until February 1997, months after Vinson's file had been closed. Later in her deposition, Douglas testified that her report was not intended to meet the "diagnostic criteria outlined in [her own] attached guidelines." However, she asserted that "most specialists in the field" would, "without a doubt," believe that her letter demonstrated "overwhelming and convincing evidence that [Vinson] *would or did have a diagnosis of dyslexia.*" (emphasis added).

How can an assertion that Vinson *would have* a diagnosis of dyslexia—if he ever was diagnosed—constitute sufficient evidence of a disability? Second, even if a specialist might be able to decipher from Douglas's 19 page letter that Vinson had a diagnosis of dyslexia, it is unreasonable to ask an untrained person to connect those same dots. Vinson's own expert witness, Bateman, accused Thomas of lacking "the knowledge or expertise to determine

---

"disability," 42 U.S.C. § 12102(2), the existing regulations are not entitled to any special deference. *See Sutton v. United Air Lines,* *Inc.*, 527 U.S. 471, 479, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

whether or not" Douglas's letter established that Vinson had a disability. I agree, which makes it all the more important that Vinson submit a specialist's *actual diagnosis*. If, in fact, a specialist could have made the diagnosis, she should have. Then, Vinson should have submitted that diagnosis to the Department.

Vinson argues that the Department was requesting information that did not exist. However, Douglas herself eventually did complete diagnostic tests, and she also asserted that a specialist could have diagnosed Vinson's dyslexia from her November 1996 letter. Indeed, a specialist in connection with this litigation—namely, Bateman—did in fact review Douglas's letter and conclude that Vinson was dyslexic. This is precisely the information the Department sought, and Douglas's and Bateman's own sworn statements prove that it was readily available.

While acknowledging that the Department is entitled to ask an individual for more information regarding his disability, *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 979 (9th Cir. 1997), the court holds that a public agency cannot request information beyond that which would satisfy a reasonable expert in the field, *supra* at 1153. This seems reasonable enough, *see Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 674 (1st Cir. 1995) ("When an applicant requests reasonable accommodation, an employer may request documentation from an appropriate professional (e.g., a doctor, rehabilitation counselor, etc.), stating that s/he has a disability.") (quotation marks omitted), but I do not agree that the Department was making an unreasonable demand of Vinson. Not only must Vinson supply evidence showing that he is dyslexic, he must also show how that impairment currently limits a major life activity. As detailed above, apparently such a diagnosis was obtainable, and it is unrealistic to require Thomas, who is not a learning disabilities specialist, to glean a diagnosis from Douglas's letter and how that diagnosis might substantially limit Vinson's present ability to learn.

Denying public agencies who provide important, but finite, services the ability to request specific documentary support of an individual's disability risks creating a system ripe for abuse. Therefore, I cannot fault the Department for seeking an actual diagnosis of dyslexia before the State expended funds on Vinson's behalf.

### C

In any event, even if Vinson had established that he is disabled, he must show that the Department closed his file solely because of his disability. *Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir.1999). This is well-established law. *E.g., Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 (9th Cir.1999). Thus, the majority's assertion that the district court erred by requiring Vinson to show that his file was closed because he was disabled befuddles me, *supra* at 1154 n. 9. The Department asserted three non-discriminatory reasons for closing his file: (1) Gina Eustaquio, Senior Rehabilitative Specialist at Intracorp and Vinson's counselor, no longer had his trust;[5] (2) Vinson demonstrated proficiency in obtaining schooling and employment on his own; and (3) he evinced a preference to rely on resources and individuals outside the program. I would add one more: Vinson failed to produce adequate information regarding his impairment.

---

5. This was demonstrated by the fact that Eustaquio requested no fewer than four times that Vinson sign a release allowing his high school records to be sent to her; he refused each time.

In *Zukle,* we applied the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to the disability discrimination context. *Zukle,* 166 F.3d at 1047; *see also Snead v. Metro. Prop. & Cas. Ins.,* 237 F.3d 1080, 1092–93 (9th Cir. 2001); *Mustafa v. Clark County Sch. Dist.,* 157 F.3d 1169, 1175–76 (9th Cir.1998). After the Department puts forth legitimate, non-discriminatory reasons for closing Vinson's file, he must demonstrate that the Department's proffered reasons were a pretext for disability discrimination. *See Snead,* 237 F.3d at 1093.

In *Weinreich,* we held that Los Angeles's transit system did not discriminate on the basis of disability by requiring updated certification of a rider's disability before he qualified for its Reduced Fare Program. 114 F.3d at 979. The transit system denied plaintiff access to the program because he could not submit an update due to financial limitations. We held that this denial was due not to his medical disability, but rather due to his own failure to satisfy a condition of eligibility. *Id.* I see little to distinguish this case from *Weinreich.* Here, Vinson was not denied a reduced course load because of his disability, rather, it was due to his failure to provide a specialist's diagnosis of dyslexia. Furthermore, like *Weinreich,* the Department's criteria were valid; there is no evidence that the Department made unreasonable demands with the discriminatory purpose to screen out disabled individuals from its programs.

Thus, I agree with the district court that even if Vinson established his disability, he failed to show that the Department closed his file because of it.

### III

I cannot agree that the district court erred by granting summary judgment on Vinson's disability discrimination claim.

Despite the opportunity and repeated requests for clarification, Vinson did not submit a clear diagnosis of dyslexia. Of course, if our caselaw were consistent with the Supreme Court's teachings, the merits of Vinson's claim would present a question without need of an answer because the constitutional sovereignty and dignity Hawai'i enjoys as a State would bar Vinson's suit against it.

I respectfully dissent.