**John GIEBELER, individually and on behalf of the General Public, Plaintiff–Appellant,**

**v.**

**M & B ASSOCIATES, a limited partnership; Alan Rubnitz; Robert Krandel; ABL Management Co.; Jay Duffus; Jan Duffus, Defendants–Appellees.**

No. 00–17508.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 12, 2002.

Filed Sept. 15, 2003.

Elizabeth Brancart, Brancart & Brancart, Pescadero, CA, for the appellant.

David R. Sylva and David S. Hoffman, David R. Sylva, Inc., Campbell, CA, for the appellee.

Before: THOMPSON, W. FLETCHER and BERZON, Circuit Judges.

### OPINION

BERZON, Circuit Judge:

John Giebeler has AIDS. Because he has AIDS, he is disabled and can no longer work, although he had worked and earned an adequate living until he became ill. Once he was no longer earning a salary, his former apartment became too expensive for him. In addition, he needed assistance with daily matters because of his illness and so wanted to live closer to his mother.

Giebeler's lack of an income stream meant that he could not meet the minimum financial qualifications of the apartment complex where he sought an apartment. Giebeler's mother, however, did meet those standards, and offered to rent the apartment so that her son could live in it. The owners of the apartment complex refused to rent either to Giebeler or to his mother, citing a management company policy against cosigners.

The question in this case is whether the Fair Housing Amendments Act (FHAA), 42 U.S.C. § 3601 *et seq.* (1995), required the apartment owners reasonably to accommodate Giebeler's disability by assessing individually the risk of nonpayment created by his specific proposed financial arrangement, rather than inflexibly applying a rental policy that forbids cosigners.

Concluding that the statute does so require, we reverse the district court's grant of summary judgment and remand the case for further proceedings.

## BACKGROUND

John Giebeler had worked as a psychiatric technician for approximately five years before becoming disabled by AIDS. At the time Giebeler had to leave work because of his disability, he was earning approximately $36,000 per year. Since 1996, Giebeler has supported himself through monthly disability benefits under the Social Security Disability Insurance (SSDI) program and housing assistance from the Housing Opportunities for People with AIDS program (HOPWA).

In May 1997, Giebeler sought to move from his two-bedroom apartment at the Elan at River Oaks complex (Elan) to an available one-bedroom unit at the Park Branham Apartments (Branham), a rental property owned by defendants (M & B). Giebeler wanted to move to the Branham unit because the rent, $875 per month, was less expensive than the $1,545 per month rent at Elan, and the Branham unit was closer to his mother's home. At the time Giebeler inquired about the Branham unit, he was receiving $837 from SSDI per month, $300 to $400 per month in a HOPWA subsidy, and varied amounts of financial support from his mother. He had a record of consistent and prompt payment of rent during his six years of residency at Elan, and his credit record contained no negative notations.

Branham resident manager Jan Duffus informed Giebeler that he did not qualify for tenancy at Branham because he did not meet the minimum income requirements. Duffus stated that Branham required prospective tenants to have a minimum gross monthly income equaling three times the monthly rent. For the apartment Giebeler wished to rent, the minimum required income was $2,625 per month, an amount less than Giebeler had earned before he became ill.

After he was informed of his ineligibility, Giebeler asked his mother, Anne Giebeler, to assist him in renting the apartment. Anne Giebeler went to the Branham office the next day for the purpose of renting an apartment that would be occupied by her son.

Like her son, Anne Giebeler had a credit record with no negative entries. Anne Giebeler had owned the same home for 27 years and had completely paid off her mortgage. The home was located less than a mile from Branham. Anne Giebeler's income was $3,770.26 per month.

Both John Giebeler and Anne Giebeler filled out application forms for the one-bedroom Branham apartment, indicating that John Giebeler would be the only resident. On his rental application, Giebeler listed his current gross income as $837 and his present occupation as "disabled." The Branham property manager rejected the applications on the basis that M & B considered Anne Giebeler a cosigner and has a policy against allowing co-signers on lease agreements.

Following the denial of his rental application, Giebeler contacted AIDS Legal Services for assistance. Attorney John Doherty wrote a letter to the Branham property manager on Giebeler's behalf, stating that Giebeler was disabled and that, under 42 U.S.C. § 3604(f)(3)(B) of the FHAA, unlawful discrimination against disabled persons in housing includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." Doherty's letter requested a reasonable accommodation for Giebeler, suggesting use of a cosigner or other alternative ar-

rangements to meet the financial requirements for tenancy.

Branham's attorney responded to Doherty's letter by confirming the rejection of Giebeler's rental application and denying that federal law required them to grant Giebeler's request for reasonable accommodation. Branham management never checked Giebeler's references or his rental or credit history nor inquired into Anne Giebeler's financial qualifications or connections to the area. Nor did the Branham management ever ask Giebeler about any additional sources of income or discuss with him any alternatives to the minimum income requirement.

In February 1998, Giebeler filed an action under the federal FHAA, the California Fair Employment and Housing Act (FEHA), the California Business and Professions Code, the California Civil Code section 54.1, and common law negligence. Giebeler's FHAA claim advanced three theories of discrimination: disparate impact, intentional discrimination, and failure to reasonably accommodate Giebeler's disability through refusal to waive the no-cosigner policy. The district court held that Giebeler had made out a prima facie case of intentional discrimination under the FHAA, violation of the California Business and Professions Code, and violation of the FEHA. The court granted summary judgment for M & B, however, on Giebeler's state law negligence claim and his FHAA disparate impact and reasonable

accommodation claims. In ruling on Giebeler's reasonable accommodation claim, the district court held that "an accommodation which remedies the economic status of a disabled person is not an 'accommodation' as contemplated by the FHA." Only the grant of summary judgment for M & B on Giebeler's reasonable accommodation claim is before us on appeal.[1]

## DISCUSSION

The FHAA provides that it is unlawful to discriminate against disabled persons[2]

> in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter,
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
>
> (C) any person associated with that buyer or renter.

42 U.S.C. § 3604(f)(1).

The FHAA's definition of prohibited discrimination encompasses "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Thus, the FHAA "imposes an affirmative duty upon landlords reasonably to accommodate the needs of

---

1. On April 26, 2001, the parties settled all claims on which the district court did not grant summary judgment. The settlement agreement expressly reserved plaintiff's right to appeal the claims on which the district court granted summary judgment. In his brief filed with this court, the plaintiff stated that he was only appealing the district court's grant of summary judgment on the reasonable accommodation claim.

2. This opinion uses the terms "disability" and "disabled," except when referring to the

FHAA's statutory language, which uses "handicap" and "handicapped." *See Helen D. v. DiDario,* 46 F.3d 325, 330 n. 8 (3d Cir.1995) ("The change in nomenclature from 'handicap' [in the Rehabilitation Act] to 'disability' [in the Americans With Disabilities Act] reflects Congress' awareness that individuals with disabilities find the term 'handicapped' objectionable.") When used, the terms "handicap" and "handicapped" have interchangeable meaning with "disability" and "disabled."

handicapped persons," *United States v. California Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1416 (9th Cir.1994) ("*Mobile Home I*"), not only with regard to the physical accommodations, *see* 42 U.S.C. § 3604(f)(3)(A) & (C), but also with regard to the administrative policies governing rentals.

■ To make out a claim of discrimination based on failure to reasonably accommodate, a plaintiff must demonstrate that (1) he suffers from a handicap as defined by the FHAA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation. *United States v. California Mobile Home Park Mgmt. Co.,* 107 F.3d 1374, 1380 (9th Cir.1997) ("*Mobile Home II*").

### A. Giebeler's Disability

The defendants do not dispute that Giebeler is disabled for the purposes of the FHAA and that they knew of his disability, nor do they deny that they refused to make the accommodation Giebeler requested. The defendants contend, rather, that the accommodation Giebeler requested is not one the FHAA requires them to accord. For the purposes of our analysis of the scope of the accommodation to which Giebeler may have been entitled, however, it is important to understand precisely why Giebeler's disability entitled him to the protections of the FHAA.

■ The FHAA defines "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1). Infection with HIV, the vi-

rus that causes AIDS, qualifies as a "physical or mental impairment" for the purposes of the FHAA. 24 C.F.R. § 100.201(a)(2); *Bragdon v. Abbott,* 524 U.S. 624, 639–642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (HIV infection is a disability under the ADA because it substantially limits major life activities); *see also id.* at 656, 118 S.Ct. 2196 (Ginsburg, J., concurring) ("Human Immuno Deficiency Virus (HIV) infection … has been regarded as a disease limiting life itself. The disease inevitably pervades life's choices: education, employment, family and financial undertakings.") (internal citations omitted). FHAA regulations further define "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working.*" 24 C.F.R. § 100.201(b) (emphasis added).

■ Giebeler's AIDS—related impairments substantially—indeed, entirely—limited his ability to work.[3] Giebeler had to leave his job as a psychiatric technician because of his illness and can no longer work. Consequently, his income stream was limited to whatever he received in disability and HOWPA payments, supplemented by financial assistance from his mother. Because of his reduced income, Giebeler did not meet the minimum income defendants' policies require of Branham tenants. If Giebeler were still able to work in the position he held before becoming ill, he would have met Branham's financial requirements. A direct causal link therefore existed between Giebeler's impairment, his inability to work, and his inability to comply with defendants' mini-

---

**3.** M&B does not challenge the validity of the regulations designating work as a major life activity. *See, e.g., Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 480, 119 S.Ct. 2139, 144

L.Ed.2d 450 (1999) (assuming validity of regulation defining major life activity under ADA).

mum income requirement relying solely on his individual income.

Given these undisputed facts, we must determine whether relaxation of Branham's no-cosigner policy to allow Giebeler to live in an apartment rented for him by his mother constituted a reasonable accommodation required by the FHAA.

## B.  Accommodation under the FHAA

The central issue in dispute in this case is whether bending a landlord's usual *means* of testing a prospective tenant's likely ability to pay the rent over the course of the lease is an "accommodation" at all within the meaning of the FHAA, let alone a reasonable one.  Permitting Giebeler to live in an apartment rented for him by his qualified mother would have adjusted for his inability, because of his disability, to earn his own income, while providing M & B with substantial assurance that the full rent—not a discounted amount—would be paid monthly.  Branham maintains, however, that an adjustment of this kind is not the type of alteration in housing policy that Congress had in mind in enacting the FHAA. Noting that Branham's no-cosigner rule adversely affects many prospective tenants who cannot meet the financial specifications without relying on the income or assets of a relative or friend, M & B would have us hold that altering that rule to aid a disabled potential tenant does not come within the FHAA's concept of accommodation because it would (1) prefer disabled over nondisabled impecunious individuals;  (2) accommodate Giebeler's poverty rather than his disability; and (3) increase M & B's financial exposure, with potential cost to the landlord should its fears that it could not collect the rent prove true.  We conclude that the FHAA's accommodation requirement does reach adjustments in the means of proving financial responsibility, and that each of Branham's arguments to the contrary runs afoul of binding case law

elucidating the "accommodation" concept in the FHAA and related statutes.

■  Before explaining our reasoning on the reach of the "accommodation" concept, we note that only "reasonable" accommodations are required by the FHAA. 42 U.S.C. § 3604(f)(3)(B).  There is some tendency in the case law to truncate the "accommodation" concept so as to preclude requirements that unreasonably burden housing providers, rather than conducting the two-step analysis mandated by the statute.  So it is important to bear in mind that a conclusion that a type of alteration to a policy is an "accommodation" within the meaning of the statute is only the first step in a multi-prong statutory analysis.

1.  The plain language of the FHAA provides scant guidance concerning the reach of the accommodation requirement. *See* 42 U.S.C. § 3604(f)(3)(B); *see also* 42 U.S.C. §§ 3607; 3604(f)(5)(C); 42 U.S.C. § 3604(f)(9) (listing exemptions to FHAA coverage and limitations on the duty to accommodate).  Similarly, the FHAA's legislative history and regulations provide us with little specific guidance as to the scope and limitations of "accommodation" under the FHAA.

The House Committee Report on the FHAA does state, however, that the interpretations of "reasonable accommodation" in Rehabilitation Act ("RA") regulations and case law should be applied to the FHAA's reasonable accommodation provision:

New subsection 804(f)(3)(B) makes it illegal to refuse to make reasonable accommodation in rules, policies, practices, or services if necessary to permit a person with handicaps equal opportunity to use and enjoy a dwelling.  The concept of "reasonable accommodation has a long history in regulations and case law dealing with discrimination on the basis of handicap.  [Footnote citing, *inter*

*alia*, 45 C.F.R. § 84.12.][4] A discriminatory rule, policy, practice, or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section would require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling. H.R. REP. No. 100–711, at 25 (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2186.

*See also id.* at 28 ("In adopting this amendment, the Committee drew on case law developed under Section 504 of the Rehabilitation Act of 1973.").

Consistent with the Report's recommendation, we have applied RA regulations and case law when interpreting the FHAA's reasonable accommodation provisions. *See, e.g., Mobile Home I*, 29 F.3d at 1417; *City of Edmonds v. Wash. State Bldg.Code Council*, 18 F.3d 802, 806 (9th Cir.1994) ("Reasonable accommodation is borrowed from the caselaw interpreting the Rehabilitation Act of 1973."), *aff'd City of Edmonds v. Oxford House*, 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995). Also, since the enactment of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101 *et seq.*, we have relied on ADA cases in applying the RA, because, as a general matter, "there is no significant difference in the analysis or rights and obligations created by the two Acts." *Vin-*

son v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir.2002). *See also Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 n. 11 (9th Cir.1999) (discussing applicability of RA interpretations to the ADA).

The concept that policies and practices must be modified in some instances to accommodate the needs of the disabled is common to all three statutory schemes. *See* 45 C.F.R. § 84.12 (§ 504 regulation); *see also Vinson*, 288 F.3d at 1154 (citing 28 U.S.C. § 35.130(b)(7)(2001), an ADA regulation); *Zukle*, 166 F.3d at 1046. We therefore look to both RA and ADA interpretations of "accommodation" of disabled individuals as indicative of the scope of "accommodation" under the FHAA. In doing so, we interpret the FHAA's accommodation provisions with the specific goals of the FHAA in mind: "to protect the right of handicapped persons to live in the residence of their choice in the community," and "to end the unnecessary exclusion of persons with handicaps from the American mainstream." *City of Edmonds*, 18 F.3d at 806 (internal quotations omitted).

2. The Supreme Court's most extensive discussion of the overall scope of the accommodation concept appears in a recent ADA case, *U.S. Airways v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). *Barnett* guides our analysis concerning the reach of the accommodation obligation under the FHAA, in two

---

4. The cited regulation is a Department of Health and Human Services—previously, the Department of Health, Education and Welfare—regulation promulgated under § 504. At the time of the Committee Report, the regulation read as here pertinent:

(a) A recipient shall make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program. . . .

(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of a recipient's program, factors to be considered include . . .

(3) The nature and cost of the accommodation needed.

The present regulation is identical to the 1988 version except that "individual" has been substituted for "applicant or employee." The regulation pertains most directly to workplace accommodation, so some of the subsections are not relevant to the present issue.

respects: First, *Barnett* holds that an accommodation may indeed result in a preference for disabled individuals over otherwise similarly situated nondisabled individuals. And second, *Barnett* indicates that accommodations may adjust for the practical impact of a disability, not only for the immediate manifestations of the physical or mental impairment giving rise to the disability.

In *Barnett*, an airline cargo handler requested, as accommodation of his back injuries, an exception to the company's seniority system so that he could transfer to a less physically demanding position. *Id.* at 1519. The airline refused to authorize a departure from its seniority rules, contending that because the ADA ensures *equal* treatment of persons with disabilities, any sort of preferential exception to a disability—neutral policy was outside the scope of the "reasonable accommodations" mandated by the statute. *Id.* at 1520–21.

Rejecting the airline's narrow interpretation of "reasonable accommodation," *Barnett* held that the ADA requires reasonable accommodations necessary to meet the disability—created needs of a disabled person, so that the disabled person may enjoy the same workplace opportunities enjoyed by nondisabled persons. *Id.* at 1521. Such reasonable accommodation in the service of equal opportunity may require preferential treatment of the disabled:

> [P]references will sometimes prove necessary to achieve the [Americans with Disabilities] Act's basic equal opportunity goal. The Act requires preferences in the form of 'reasonable accommodations' that are needed for those with disabilities to obtain the *same* workplace opportunities that those without disabilities enjoy. By definition any special 'accommodation' requires the employer to treat an employee with a disability differently, *i.e.*, preferentially.

And the fact that the difference in treatment violates an employer's disability-neutral rule cannot by itself place the accommodation beyond the Act's potential reach.

> Were that not so, the "reasonable accommodation" provision could not accomplish its intended objective.... Many employers will have neutral rules governing the kinds of actions most needed to reasonably accommodate a worker with a disability.

*Id.*

The objection that Branham need not permit Giebeler to live in an apartment rented by his financially-qualified mother because other prospective tenants unable to meet the financial qualifications on their own also cannot rent apartments therefore runs afoul of *Barnett*. Just as Barnett was not disqualified from an adjustment to his seniority rank simply because other, nondisabled employees desired the position he sought but were barred from obtaining it by the seniority policy, so Giebeler was not disqualified from an adjustment in Branham's financial qualification/no cosigner standard simply because there were other prospective tenants similarly unable—albeit for reasons other than disability-to earn enough money to meet the rental company's credit standards.

Additionally, *Barnett* indicates, inferentially if not expressly, that a required accommodation need not address "barriers that would not be barriers *but for* the [individual's] disability." *Barnett*, 535 U.S. at 413, 122 S.Ct. 1516 (Scalia, J., dissenting). Justice Scalia maintained vigorously in his dissent in *Barnett* that "the ADA eliminates workplace barriers only if a disability prevents an employee from overcoming them" and does not require adjustment of "rules and practices that bear no more heavily upon the disabled employee than upon others—even though an exemp-

tion from such a rule or practice might in a sense 'make up for' the employee's disability." *Id.* Changes in seniority rules, maintained Justice Scalia, cannot be accommodations on this understanding of the accommodation concept, as "a seniority system ... burdens the disabled and non-disabled alike ...," and so is not "a disability-related obstacle." *Id.*

The majority in *Barnett* did not accept this reasoning. *Id.* at 1521 (rejecting "the position taken by ... Justice Scalia to the contrary" of the opinion's holding regarding preferential treatment). Instead, the opinion held that in some circumstances—circumstances having to do with the nature of the employer's commitment to its seniority system, not with the obstacles faced by a particular disabled employee—modification of a seniority system might be a required accommodation. *Id.* at 1525. *Barnett* therefore recognized that the obligation to "accommodate" a disability can include the obligation to alter policies that can be barriers to nondisabled persons as well.

It is worth noting that Giebeler's inability to pay the rent without drawing on his mother's financial resources was *not*, in Justice Scalia's words, the result of "obstacles that have nothing to do with the disability." *Id.* at 1529. Although Barnett's inability to meet the seniority requirement for the position he wanted was simply the result of his tenure in his job, not of his disability, the reason Giebeler could not pay the rent from his own income was that his disability prevented him from working and earning a monthly paycheck as he used to. So, applying Justice Scalia's un-

derstanding of the accommodation concept, Giebeler's request that he be permitted to assure his prospective landlord of payment through his mother's financial resources rather than his own would qualify as an accommodation. Yet, under *Barnett,* even if one disregards the fact that Giebeler had formerly held a qualifying job and was forced to leave it because of his disability, the accommodation he seeks might still qualify as an accommodation under the FHAA, as long as adjusting Branham's method of judging financial responsibility would aid him in obtaining an apartment he could otherwise not inhabit because of his disability.[5]

Our cases involving FHAA challenges to generally applicable zoning policies confirm that reasonable accommodations can function to adjust for special needs that flow from the inability of disabled residents to meet otherwise applicable financial requirements. In *Turning Point, Inc. v. Caldwell,* 74 F.3d 941 (9th Cir.1996), for example, we held that the City of Caldwell had unlawfully refused to accommodate disabled residents of Turning Point, a non-profit homeless shelter, by refusing to waive annual review of the special use permit that allowed the shelter to house more than the maximum number of persons dictated by the area zoning policy.

In so holding, we observed that 75% of the shelter's residents had serious mental or physical disabilities that "prevent these persons from maintaining employment, obtaining education or securing permanent housing." *Id.* at 942. The district court had found that the maximum occupancy

**5.** An example might be an individual who needed a ground floor apartment because of his disability, where such apartments are more expensive. If the individual was able to work but did not earn enough money to qualify for the more expensive apartment, *Barnett* suggests that—if the accommodation were adjudged reasonable—the landlord could be re-

quired to accommodate the disabled renter by accepting a cosigner or allowing him to live in an apartment rented by a relative. We need not decide whether *Barnett* so requires, however, as Giebeler's disability *is* the barrier that prevents him from meeting the financial responsibility standard in the manner Branham prescribes.

limit "was a severe financial burden on [the shelter] that would eventually force it to close." *Id.* at 944. Relying on this finding, we reasoned that annual review of the special use permit—a process that threatened to discontinue the financially necessary waiver of the maximum occupancy rule in the future—was unjustified and violated the FHAA's reasonable accommodation mandate. *Id.* at 945.

Similarly, in *City of Edmonds v. Washington State Bldg. Code Council,* we held that a residence for recovering alcoholics and drug addicts that required six or more residents per house to be financially self-sufficient, to comply with federal requirements for start-up loans, and to provide a supportive atmosphere for the residents, might be entitled to a variance from a single-family zoning ordinance that restricted the number of unrelated persons who could reside in a single home in a residential neighborhood. 18 F.3d at 803–06. We noted that zoning regulations would not always be immune from FHAA requirements:

> Courts must ask whether a city's zoning satisfied FHAA standards, or whether a city has to alter neutral zoning policies to reasonably accommodate and integrate handicapped persons. The answers will vary depending on the facts of a given case. But these questions must be posed, or the policies the FHAA seeks to enforce will be frustrated.

*Id.* at 806. Thus, in *City of Edmonds* we recognized that even when a neutral poli-cy's adverse effect on disabled persons is attributable to financial limitations faced by disabled persons in securing housing, the FHAA may require an exception to the policy as a reasonable accommodation.[6]

3. There is one additional principle regarding the general nature of the concept of accommodations that is pertinent here as well: Accommodations need not be free of all possible cost to the landlord (although, again, a landlord need not incur a cost or risk of cost that is not "reasonable," a major qualification that we discuss later).

*Mobile Home I* establishes that financial considerations do not *automatically* disqualify a requested accommodation:

> We find the effort to distinguish accommodations that have a financial cost from other accommodations unconvincing. Besides the fact that § 3604's reasonable accommodations requirement contains no exemption for financial costs to the landlord, [footnote omitted] the history of the FHAA clearly establishes that Congress anticipated that landlords would have to shoulder certain costs involved, so long as they are not unduly burdensome.

*Id.* at 1416. *Cf. Cripe v. City of San Jose,* 261 F.3d 877, 880 (9th Cir.2001) (stating that the ADA "requires every type of employer [to] find ways to bring the disabled into its ranks, even when doing so imposes some costs and burdens"); *Arneson v. Sullivan,* 946 F.2d 90, 92 (8th Cir.1991) (re-

---

6. In similar circumstances, other circuits have also recognized that exceptions to neutral policies may be mandated by the FHAA where disabled persons' disability-linked needs for alterations to the policies are essentially financial in nature. *See, e.g., Smith & Lee Assocs. v. City of Taylor,* 102 F.3d 781, 795–96 (6th Cir.1996) (holding that, where group homes were necessary to prevent the exclusion of disabled persons from residential neighborhoods but were not economically feasible without nine residents, City had to reasonably accommodate by altering the six-person occupancy limit specified by law for residentially-zoned areas); *Elderhaven, Inc. v. City of Lubbock,* 98 F.3d 175, 179 (5th Cir. 1996) ("[T]he economics of group living arrangements often require a critical mass of residents in order to make feasible the type of alternative living arrangements that the Fair Housing Act was designed to encourage.")

quiring employer to expend a "reasonable amount ... to provide a distraction-free environment," and, if necessary, to provide the plaintiff with a "reader" to assist him in his assigned tasks as reasonable accommodations under the Rehabilitation Act). Thus, disability-neutral administrative policies like Branham's tenant income qualifications do not escape all scrutiny under the FHAA's reasonable accommodation mandate simply because they are based on financial considerations or may involve a *risk* of some financial cost to the landlord.[7]

4. Despite this solid line of Supreme Court and Ninth Circuit precedent, the district court and the defendants rely on two out-of-circuit cases that hold that however reasonable the requested accommodation, the FHAA does not require landlords or cities to accommodate needs generated by the inability of disabled individuals to generate income by working. *See Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir.1998); *Hemisphere Building Co. v. Village of Richton Park*, 171 F.3d 437 (7th Cir.1999).

*Salute* held that accommodations of one's personal economic situation are outside the scope of the FHAA's reasonable accommodation requirement, apparently even where the disabled individual's economic status is the direct result of her disability. *See* 136 F.3d at 301–302; *see also id.* at 309–310 (Calabresi, J., dissenting) (noting that the plaintiffs were poor "*as a direct result* of their handicap" and that "[t]hey say that their disabilities prevent them from working, which necessarily makes them poor"). The *Salute* majority deemed it "fundamental that the law addresses the accommodation of handicaps,

not the alleviation of economic disadvantages that may be correlated with having handicaps. Ordinarily, the duty to make reasonable accommodations is framed by the nature of the particular handicap." *Id.* at 301. Judge Calabresi dissented, reasoning that where the individuals in question are poor *because* they are disabled, a reasonable adjustment of policies requiring tenants to qualify on the basis of their own income rather than on the basis of other financial resources available to them for paying rent is, like allowing a blind tenant to keep a seeing eye dog despite a rule against pets, an accommodation of a need created by the disability. Maintaining that "[t]he FHAA does not elevate the rights of the handicapped poor over the rights of the non-handicapped poor," *id.* at 302, the *Salute* majority rejected Judge Calabresi's reasoning.

The Seventh Circuit in *Hemisphere* also rejected the notion that the FHAA may require accommodation of disability generated financial limitations. *Hemisphere* reasoned that if zoning rules must be waived to make housing more affordable for the disabled, so too must building codes, minimum wage laws, or construction safety regulations that made construction of housing for the disabled more expensive:

> The result that we have called absurd is avoided by confining the duty of reasonable accommodation in "rules, policies, practices, or services" to rules, policies, etc. that hurt handicapped people *by reason of their handicap*, rather than hurt them solely by virtue of what they have in common with other people such

---

**7.** It is quite possible—indeed, likely—that in fact there will be *no* financial loss to the defendants. Giebeler requested only a different way of proving that the same rent will be paid for the apartment he lives in as is paid for similar apartments in the complex. He

did not seek to pay less rent or to provide evidence of a lower monthly income with which to pay the rent—he only asked that the income relied upon be his mother's instead of his own.

as a limited amount of money to spend on housing.

171 F.3d at 440.

We reject the reasoning of *Salute* and *Hemisphere*, despite the facial appeal of some of the slippery-slope reasoning of those opinions, for three reasons we find compelling:

First, both *Salute* and *Hemisphere* were decided before *Barnett*, and their reasoning cannot be reconciled with the Supreme Court's analysis in that case. *Barnett*, as we have explained, held that accommodation requirements (1) do sometimes require preferring disabled individuals over others who are otherwise similarly situated but are not disabled; and (2) are not limited only to lowering barriers created by the disability itself. Limiting accommodation to those "rules, policies, etc. that hurt handicapped people *by reason of their handicap*," *Hemisphere*, 171 F.3d at 440, or requiring that accommodations be "framed by the nature of the particular handicap," *Salute*, 136 F.3d at 301, because "[t]he FHAA does not elevate the rights of the handicapped poor over the rights of the nonhandicapped poor," *id.* at 302, contradicts both principles embraced by *Barnett*.[8]

Second, the reasoning of these two opinions captures concerns that *are* taken into account within the analysis required by *Barnett* and by the FHAA as we understand it. Under the FHAA, as under the RA and the ADA, only *reasonable* accommodations that do not cause undue hardship or mandate fundamental changes in a program are required. *Barnett* held that although adjustments in seniority rules could be accommodations within the intendment of the disability statutes, such adjustments are ordinarily not *reasonable* accommodations, and therefore are required only in unusual circumstances. Similarly, it is probable that all or most of the changes in long-established policies that *Salute* and *Hemisphere* march out as inevitably mandated by the FHAA unless the economic circumstances caused by disability are cordoned off entirely from the accommodation requirement would be deemed, on examination, unreasonable "ordinarily or in the run of cases," *Barnett*, 535 U.S. at 401, 122 S.Ct. 1516, and therefore not required. We expect, for example, that mandating lower rents for disabled individuals would fail the kind of reasonableness inquiry conducted in *Barnett*. But *Salute* and *Hemisphere* held, inconsistently with *Barnett*, that courts should never *get* to the reasonableness inquiry where economic circumstances related to disability are at stake. Now that *Barnett* has been decided, that approach is foreclosed.

Finally, the Second Circuit's decision in *Salute* and the Seventh Circuit's decision in *Hemisphere* are in tension with our zoning cases, already discussed, which recognize that governmental entities may be required to bend zoning and land use requirements in recognition of the need of disabled individuals for group living arrangements. *See Turning Point*, 74 F.3d at 945; *City of Edmonds*, 18 F.3d at 806.

---

8. In a case decided after *Barnett, Oconomowoc Residential Programs Inc. v. City of Milwaukee*, 300 F.3d 775, 787 (7th Cir.2002), the Seventh Circuit appears to have taken a different view of the obligation to accommodate disability-caused economic circumstances from the one embraced in *Hemisphere*. In that case, the Court of Appeals reasoned that a zoning variance was necessary to provide plaintiffs with an equal opportunity to use and enjoy a dwelling, in part because "[n]either woman could afford to purchase a home on her own." The court also acknowledged that its ruling would grant preferential treatment of disabled over non-disabled persons: "[G]roup living arrangements can be essential for disabled persons who cannot live without the services such arrangements provide, and not similarly essential for the non-disabled." *Id.*

Disabled individuals, true, may need group homes not only to have somewhere they can afford to live but also to have access to physical therapy, nursing care, and other medical needs. But those resources can be, and are, provided in individual houses or apartments to more prosperous individuals. The need to take advantage of economies of scale to make such resources available to the less well-off is the result of the economic circumstances of the residents.

■ We conclude that Giebeler's request that he be permitted to reside in an apartment rented by his financially qualified mother is a request for an accommodation that, under the FHAA, he was entitled to receive *if* the adjustment both "may be necessary to afford [him] equal opportunity to use and enjoy a dwelling" and was "reasonable" within the meaning of that statute. *See* 42 U.S.C. § 3604(f)(3)(B). It is to those questions that we now turn.

## C. Causation and Reasonableness

### 1. Causation

To prove that an accommodation is necessary, "[p]laintiffs must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." *Smith & Lee,* 102 F.3d at 795. Put another way, "[w]ithout a causal link between defendants' policy and the plaintiff's injury, there can be no obligation on the part of defendants to make a reasonable accommodation." *Mobile Home II,* 107 F.3d at 1380.

Imposition of burdensome policies, including financial policies, can interfere with disabled persons' right to use and enjoyment of their dwellings, thus necessitating accommodation. *See Shapiro v. Cadman Towers,* 51 F.3d 328, 335–36 (2d Cir.1995) (holding that a landlord's failure to grant a disabled tenant an exception to "first come-first served" waiting list for

tenant parking substantially affected tenant's use and enjoyment of her dwelling); *Samuelson v. Mid–Atlantic Realty,* 947 F.Supp. 756, 761 (D.Del.1996) (finding waiver of a landlord's required lease termination fee a necessary reasonable accommodation under the FHAA because "[i]t is clear that generally applicable fees ... can interfere with the use and enjoyment of housing by the handicapped"). While in some cases the plaintiff will not be able to show that alteration of a particular policy "may be necessary" to her use and enjoyment of the property, *see Mobile Home II,* 107 F.3d at 1380, the causation requirement poses little hurdle in a case such as this one, where a landlord's policy entirely prevents a tenant from living in a dwelling. *See id.* at 1382 n. 3 (holding that, in zoning cases, causation is not a hurdle in proving necessity of accommodation because "[t]he city policies directly interfere with use and enjoyment because they prevent the housing from being built").

Here, the causal link between Branham's failure to accommodate and Giebeler's disability is obvious. Giebeler was unemployed because of his disability and therefore had insufficient income to qualify for the apartment. Once Branham refused to allow Anne Giebeler to rent an apartment for her son to live in, Giebeler could not show financial ability to pay the rent and therefore could not live in the housing complex. Allowing Anne Giebeler to rent an apartment on her son's behalf, or in some other manner accommodating his inability to prove financial responsibility in the usual way, was necessary to enable Giebeler to live in an apartment at Branham.

In addition to causation, equal opportunity is a key component of the necessity analysis; an accommodation must be possibly necessary to afford the plaintiff equal opportunity to use and enjoy a dwelling.

*See Howard v. City of Beavercreek,* 276 F.3d 802, 806 (6th Cir.2002). M & B's refusal to allow Anne Giebeler to rent an apartment for her son denies him an opportunity for which he would otherwise be qualified. With Anne Giebeler as renter, Giebeler could satisfy Branham's minimum income requirement and ensure that Branham receives its monthly rent. Giebeler is similarly situated to other tenants at Branham in terms of the financial resources he can bring to a tenancy at Branham. It is his way of demonstrating and deploying these resources that is different.[9] So defendants' relaxation of their no cosigner policy "may be necessary" to afford Giebeler equal opportunity to use and enjoy a dwelling at Branham.

### 2. Reasonableness

(a) *Burden of Proof:* We have not decided previously whether the plaintiff or the defendant in an FHAA case bears the burden of showing whether a proposed accommodation is reasonable. There is, however, both RA and ADA precedent on the question.

Under the RA case law, a plaintiff requesting accommodation bears the "initial burden of producing evidence that a reasonable accommodation was possible." *Vinson,* 288 F.3d at 1154. Once evidence of the possibility is produced, the burden shifts to the other party to produce rebuttal evidence that the requested accommodation is not reasonable. *Id.*

In the ADA employment context, *Barnett* articulates the applicable burden of proof slightly differently: *Barnett* places the burden of showing the reasonableness of an accommodation on the plaintiff. *See* 535 U.S. at 401, 122 S.Ct. 1516. *Barnett* stresses, however, that the plaintiff need only show that an accommodation "seems reasonable on its face, *i.e.,* ordinarily or in the run of cases." *Id.* at 401, 122 S.Ct. 1516. Once the plaintiff has made this showing, the burden shifts to the defendant to demonstrate that the accommodation would cause undue hardship in the particular circumstances. *Id.* at 402, 122 S.Ct. 1516. If the plaintiff cannot make the initial showing that the requested accommodation is reasonable in the run of cases, he "nonetheless remains free to show that special circumstances warrant a finding that ... the requested 'accommodation' is 'reasonable' on the particular facts." *Id.* at 405, 122 S.Ct. 1516. Thus, under *Barnett,* case-specific circumstances may make it reasonable for certain defendants to make accommodations even where such accommodations are not reasonable in most cases.

As we have already observed, this court ordinarily applies RA case law in applying the reasonable accommodation provisions of the FHAA, but also generally applies RA and ADA case law interchangeably. That three-way interaction leaves us a bit up in the air at this juncture, as *Barnett* may have application to the RA mode of proof and therefore the mode of proof to be applied in FHAA cases. *Vinson* was filed four days after *Barnett,* and, not surprisingly, does not discuss the *Barnett* mode of proving the reasonableness of a

---

**9.** Unlike the ADA, the FHAA does not explicitly require that a disabled individual must be "qualified" except for his disability or able to meet the "essential" requirements of the housing he seeks to occupy. *See Morton v. UPS,* 272 F.3d 1249, 1254–55 (9th Cir. 2001) (discussing these requirements under the ADA). Even if similar requirements are implicit in the "reasonable accommodation" requirement, a question we do not decide, Giebeler meets them: He has been a model tenant in his other apartments; he has good credit; and relaxation of the no cosigner policy does not waive the essential financial requirement for tenancy, namely, access to sufficient financial resources to pay the monthly rent.

proposed accommodation. There is no need in this case, though, to decide whether *Vinson* and *Barnett* state essentially the same allocation of burdens or differ in a way likely to be outcome determinative in some instances.[10] Either description of the burden allocation leads to the same result in this case: Giebeler's requested accommodation was reasonable.

(b) *Merits of the Reasonableness Analysis:* Ordinarily, an accommodation is reasonable under the FHAA "when it imposes no 'fundamental alteration in the nature of the program' or 'undue financial or administrative burdens.'" *Howard*, 276 F.3d at 806 (quoting *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) (holding, in an ADA reasonable accommodation case, that where a rule is peripheral to the nature of defendants' activities, "it may be waived in individual cases without working a fundamental alteration").

In this case, Giebeler has met his burden of demonstrating that the particular accommodation he requests—allowing an eligible relative to rent an apartment for him—is "reasonable on its face, *i.e.,* ordinarily or in the run of cases." *Barnett*, 535 U.S. at 401, 122 S.Ct. 1516. He has also met his burden, as articulated in *Vinson,* of producing evidence showing that the accommodation was reasonable and possible. *Vinson,* 288 F.3d at 1154.

The record reveals that, as one would expect, the purpose of M & B's minimum income requirement is to ensure that tenants have sufficient income to pay rent consistently and promptly. This interest is, of course, considerable. However, allowing a financially eligible relative to rent an apartment for a disabled individual who, except for his current financial circumstances, is qualified to be a tenant does not unreasonably threaten this interest.

The rental arrangement requested by Giebeler would not require Branham to accept less rent, would not otherwise alter the essential obligations of tenancy at Branham (such as appropriate behavior and care of the premises), and would provide a lessee with the proper financial qualifications and credit history. As the official renter of the apartment, Anne Giebeler would be primarily responsible for the rent, thereby obviating the need for M & B to first go to her son to collect rent before pursuing her for unpaid rent. Rentals by parents for children are not unusual in most rental markets. *See, e.g., Schanz v. Village Apartments,* 998 F.Supp. 784, 787 (E.D.Mich.) (landlord refused to rent to a disabled individual with serious credit problems or allow a nonrelated guarantor, but would have allowed him to live there if a blood relative cosigned the lease); *cf. Boyd v. Lefrak Organization,* 509 F.2d 1110 (2d Cir.1975) (apartment complex would have allowed a financially ineligible prospective tenant to rent if he obtained an eligible cosigner). Even if M & B does not ordinarily permit such rentals at the Branham complex, asking a landlord to accept an alternative way of proving financial responsibility acceptable to many other landlords is likely to be reasonable in the run of cases.

Indeed, the FHAA recognizes that nondisabled persons may choose to rent apartments for occupancy by disabled persons and protects these arrangements: "[I]t shall be unlawful ... [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of

---

**10.** In *Oconomowoc,* the Seventh Circuit applied *Barnett's* burdenshifting regime in a suit under the FHAA. 300 F.3d at 783 (7th Cir. 2002) (placing the burden on the plaintiffs to show that the accommodation they sought was reasonable on its face).

... a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." 42 U.S.C. § 3604(f)(1). Thus, the FHAA appears to protect not just disabled people who buy or rent their own residences, but also disabled people who reside in a residence rented by a non-disabled person, the arrangement Giebeler sought in this case.

Giebeler made the necessary initial showing that the requested accommodation was reasonable on the particular facts of this case. *Barnett*, 535 U.S. at 405, 122 S.Ct. 1516. (Whether waiver of a no cosigner policy would be reasonable accommodation in the run of cases is a question we do not decide.) Branham, however, failed to meet its burden of demonstrating that in the particular circumstances of this case the requested accommodation would cause it to suffer undue hardship. *Id.* at 402, 122 S.Ct. 1516. Branham also failed to carry its burden as articulated in *Vinson* of rebutting the showing made by Giebeler that the requested accommodation was in fact reasonable. *Vinson*, 288 F.3d at 1154.

There is no evidence in the record demonstrating that M & B is in any way unusual among landlords in its need to insist that the resident alone rather than a relative sign the lease and take responsibility for paying the rent. The particular parent seeking to rent for her disabled child, Anne Giebeler, presented no unusual risks either. Although, like any other such parent, she would not have lived on-site, she was both a good credit risk and easy to track down; her income, based on monthly pension checks, was a reliable and ample source of rent funds; and she had an unblemished credit record.[11] Anne Giebeler also had significant assets, including a home which she had owned and resided in for 27 years and for which she had paid off the mortgage in full. Her home is located less than a mile from the Branham complex. In short, by allowing Anne Giebeler to rent the apartment so that her disabled son could live in it, Branham would not assume any substantial financial or administrative risk or burden.

Even if one views the requested arrangement as the defendants did—i.e., as a cosignership, requiring waiver of the partnership's no-cosigner policy—the requested accommodation was still reasonable on the particular facts here. While Branham managers have identified some administrative burdens and expenses that could result from having to track down a cosigner when a tenant fails to pay rent, they have on occasion waived the minimum income requirement and allowed cosigners and other alternative arrangements. *See Barnett*, 535 U.S. at 405, 122 S.Ct. 1516 (Although modification to a seniority system is not ordinarily a reasonable accommodation, a plaintiff can demonstrate that reasonableness in particular circumstances, such as when the system "already contains exceptions such that, in the circumstances, one further exception is unlikely to matter."). [12]

---

11. Ann Giebeler died during the course of this litigation. The fate of the lease upon Ann Giebeler's death would presumably be the same as if she was a resident of the apartment. There is no indication in the record that the reason M & B refused to rent to Ann Giebeler so that her son could live there is that it was concerned that she was likely to die during the term of the lease.

12. Viewed either as a rental by a parent for a disabled child or as a cosigner arrangement, the requested accommodation in this case differs from the one requested in *Salute* in two ways that could be significant in a reasonableness analysis (although we do not, of course, decide whether the accommodation requested in *Salute* was or was not reasonable under the FHAA, as the question is not before us).

In *Salute*, the accommodation requested was waiver of an established policy against accepting vouchers under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437(f), as payment for the rent. *Salute*

We stress once more that Giebeler was in no way trying to avoid payment of the usual rent for the apartment he wanted to live in, nor was he proposing to leave M & B without a means of ascertaining that an individual with the means to pay that rent would be responsible for doing so. Giebeler's modest request that his financially qualified mother be allowed to rent an apartment for him to live in, affording him the opportunity to live in a suitable dwelling despite his disability, was a request for a reasonable accommodation within the intendment of the FHAA, and should have been honored.

## CONCLUSION

The judgment of the district court is reversed, and the case remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

emphasized that Congress had recognized the considerable bureaucratic entanglement entailed by Section 8 and consequently included in Section 8 an explicit policy against compelling landlords to accept Section 8 tenants. 136 F.3d at 300 ("We think that the voluntariness provision of Section 8 reflects a congressional intent that the burdens of Section 8 participation are substantial enough that participation should not be forced on landlords, either as an accommodation to handicap or otherwise."); *id.* at 301 ("[T]he burden of participating in the Section 8 program cannot be viewed as imposing only reasonable costs or insubstantial burdens, if only because Congress decided this issue by making participation [in the Section 8 program] voluntary."). Here, conversely, the statute, as noted in the text, appears affirmatively to protect arrangements whereby a disabled person lives in an apartment rented by another.

Additionally, unlike the tenants in *Salute*, Giebeler proffered a proposed lessee, Ann Giebeler, who more than met the economic qualifications required to rent at Branham and demanded no special, burdensome rights as a condition of her tenancy. In contrast, the *Salute* court was concerned that "participation in a federal program will or may entail financial audits, maintenance requirements, increased risk of litigation, and so on." 136 F.3d at 301.