Tavis MILLER, Plaintiff,

v.

UNITED PARCEL SERVICE, INC., Defendant.

3:14-CV-872-PK

United States District Court, D. Oregon.

Signed March 9, 2016

Matthew C. Ellis, Law Office of Matthew C. Ellis, 621 SW Morrison St. Suite 1050, Portland, OR 97205, (503) 226-0072, Attorneys for Plaintiff

Joanna T. Perini–Abbott, Calvin L. Keith, Perkins Coie, LLP, 1120 NW Couch Street, 10th Fl., Portland, OR 97209-4128, (503) 727-2000, Attorneys for Defendant

## ORDER

BROWN, United States District Judge

Magistrate Judge Paul Papak issued Findings and Recommendation (#39) on January 22, 2016, in which he recommended this Court deny United Parcel Service, Inc.'s (UPS) Motion (#23) for Summary Judgment pursuant to the Federal Rule of Civil Procedure 56. The matter is now before this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and the Federal Rule of Civil Procedure 72(b).

Because no objections to the Magistrate Judge's Findings and Recommendation were timely filed, this Court is relieved of its obligation to review the record *de novo*. *United States v. Reyna–Tapia*, 328 F.3d 1114, 1121 (9th Cir.2003). *See also* Kimberly Day v. United Parcel Service, Inc., 2:09-CV-1261, (D. Or. 2011). Having reviewed the legal principles *de novo*, the Court does not find any error.

## CONCLUSION

The Court **ADOPTS** Magistrate Judge Papak's Findings and Recommendation (#39). Accordingly, the Court **DENIES** the Defendant's Motion (#23) for Summary Judgment.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

PAPAK, Magistrate Judge:

Plaintiff Tavis Miller filed this action against his employer, defendant United Parcel Service, Inc. ("UPS"), on May 30, 2014, Miller has been employed by UPS since 2005, and served UPS as a full-time hub supervisor managing package handlers at UPS' Swan Island "hub" facility beginning at some time in 2010, Later in 2010, Miller was diagnosed with congenital absence of the inferior vena cava and associated deep vein thrombosis, a painful and potentially life-threatening condition, Miller took medical leaves of absence from his employment with UPS in connection with that condition for part of 2010 and for an extended period spanning all or nearly all of 2012, all of 2013, and part of 2014. On two occasions during his second medical leave of absence, Miller sought to return to work subject to certain restrictions, but was not permitted by UPS to do so on the asserted ground that he would be unable to perform essential functions of his job as a full-time hub supervisor while subject to those restrictions. In January 2014, UPS found alternative employment for Miller in a management position that both parties agreed would not contravene the restrictions recommended by Miller's physicians, and raised the hourly wage associated with that position to ensure that in the new position Miller would earn at least the same annual compensation that he had received in his former position. Miller accepted the proffered alternative position on that basis. At some time in early to mid–2014, Miller received an additional raise in his hourly rate. Miller Is currently working for UPS in that same managerial position.

Arising out of the foregoing, Miller alleges UPS' liability under both Title I of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12111–12117, and Oregon's Unlawful Discrimination against Persons with Disabilities statutory scheme (the "UDPD"), Or. Rev. Stat. 659A.104–145, for disability discrimination in employment, failure to accommodate, failure to engage in the interactive reasonable accommodation process, and/or wrongful termination of his employment. Miller seeks award of lost wages, benefits, and other economic damages in an unspecified amount, compensatory damages for emotional distress in an unspecified amount, injunctive relief to preclude defendant from similar employment practices in the future, and award of his attorney fees and costs. This court has federal-question jurisdiction over Miller's ADA claim pursuant to 28 U.S.C. § 1331, and may properly exercise supplemental jurisdiction over Miller's UDPD claim pursuant to 28 U.S.C. § 1367.

Now before the court is UPS' motion (# 23) for summary judgment. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, UPS' motion should be denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other ma-

terials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## MATERIAL FACTS

### I. The Parties

Defendant UPS is an Ohio corporation headquartered in Georgia. UPS is in the package delivery business, and maintains a facility in Portland, Oregon (the "Swan Island hub" facility), where it processes between 90,000 and 150,000 packages per 3.5–4.5 hour employee shift. Plaintiff Miller is an individual citizen of the State of Oregon, and an employee of defendant

UPS working in its Swan Island hub facility.

## II. Material Factual History [1]

Miller began working for UPS at its Swan Island hub as a part-time package handler in 2005. *See* Declaration (# 24) of Joanna T. Perini–Abbott ("Perini–Abbott Decl. I"), Exh. 1 (Deposition of Tavis Miller ("Miller Depo.")), 11:23–12:16; *see also* Declaration of Tavis Miller ("Miller Decl."), ¶ 3. In or around late 2007 or early 2008, he became a part-time supervisor of package handlers at that same facility. *See* Miller Depo., 12:17–21; Miller Decl., ¶ 3; *see also* Complaint, ¶ 14. In early 2010, Miller became a full-time hub supervisor managing package handlers at the Swan Island hub. *See* Miller Depo., 13:11–13, 32:2–4; Miller Decl., ¶ 3.

In his position as a full-time hub supervisor, Miller would typically work an 11 hour day, of which approximately six hours would be spent on the hub floor, including the entirety of the 3.5–4.5 hour package-handler shift. *See* Miller Depo., 45:22–46:2. During the 3.5–4.5 hour package-handler shift, Miller's work group—consisting of five part-time supervisors overseeing from 5–12 package-handlers—would typically sort between 40,000 and 60,000 packages, although the number of packages and the number of work hours devoted to sorting packages would increase during the peak season from November to January, *See id.*, 56:9–57:2, 57:7–58:11, 58:19–21. The hub floor covered a relatively large area, compassing either 30 or 50 bay doors used for loading trailers, depending on the assignment. *See id.*, 51:11–15, 54:20–55:18.

Current UPS full-time hub supervisor Matt Evans testifies that his job position "requires [him] to be constantly moving around the hub, up and down ladders, in and out of trucks." Declaration of Matt Evans ("Evans Decl."), ¶ 2. Evans further testifies that he "rarely, if ever, sit[s] down while the hub is running [*i.e.*, during the 3.5–4.5 hour package-handler shift] because [the] job requires [him] to be on the move." *Id.*, ¶ 3. Evans further testifies that "[t]o the extent that some days [he] do[es] get to sit down for short periods of time, the hub operations are unpredictable and more days than not, [he] ha[s] no breaks in which [he] could sit down while the hub is running." *Id.*, ¶ 4. Evans further testifies that the job "frequently" requires him to stand "for more than two hours at a time." *Id.*, ¶ 5. Evans further testifies that the job is still more physically demanding in November and December, *See id.*, ¶ 6. Current UPS full-time hub supervisors Chris Celorie and Steve Hoon offer precisely the same testimony. *See* Declaration of Chris Celorie ("Celorie Decl.") ¶¶ 2–6; Declaration of Steve Hoon ("Hoon Decl.") ¶¶ 2–6. Miller testifies that his job duties as a full-time hub supervisor differed from those of Evans, Celorie, and Hoon in that he oversaw fewer part-time supervisors than they did and worked in a different part of the hub. *See* Miller Decl., Exh. 9. Miller further testifies that there are multiple places to sit while on the hub floor, and that while working the hub floor he often had an opportunity to sit or lean while performing his job duties. *See id.*, ¶ 7.

UPS offers into evidence a document that UPS human resources employee Dominique Johnson characterizes as listing the "UPS Essential Job Functions" for an "Operations Supervisor/Manager" position, including the full-time hub supervisor position. *See* Perini–Abbott Decl. I, Exh. 16

---

1. Except where otherwise indicated, the following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.

(the "Essential Job Functions Document"); *see also* Perini–Abbott Decl. I, Exh, 2 (Deposition of Dominique Johnson Vol. I ("Johnson Depo. I"), 57:1–23. The Essential Job Functions Document asserts that the "U.S. Department of Labor Physical Demand level" for Operations Supervisor/Manager positions is "HEAVY" and, under the rubric of "Functional Tolerances /Physical Performances Required," indicates that such positions require the capacity to sit "0%" of the work shift or "Never," and to stand and to walk "67–100%" of the work shift or "Constant[ly]." Essential Job Functions Document, p. 1. Notwithstanding the foregoing, Miller offers into evidence what appears to be a job description specifically for the full-time hub supervisor position at UPS. *See* Declaration of Tavis Miller ("Miller Decl."), Exh. 11 (the "Job Description Document"), The Job Description Document is entirely silent as to any requirement regarding the physical capacity to stand or walk (or indeed any other physical capacities), *See id.* The Job Description Document indicates that the hub supervisor is responsible for managing hub and sort activities, including analysis of volume projections, monitoring of package-handler compliance with applicable safety practices, supervising and developing package handlers, performing package-handler duties as needed, and maintaining efficient flow of packages through the hub. *See id.*

Not long after receiving the promotion to full-time hub supervisor, Miller was diagnosed with congenital absence of the inferior vena cava, a condition that causes deep vein thrombosis, or blood clots. *See* Miller Decl., ¶ 2. Apparently at or around that time, Miller's physicians advised him that he had a large blood clot in his leg, posing the risk that it could one day dislodge, travel to his heart and lungs, and cause a pulmonary embolism. Miller Depo., 67:13–69:25, 74:2–24, 123:2–14. Due to the pain symptoms associated with the blood clot, Miller took a medical leave of absence lasting approximately one month in early 2010, during which time he received disability benefits. *See id.*, 39:4–40:2; *see also* Miller Decl. ¶ 5. After approximately one month's medical leave, Miller returned to work with restrictions as to the number of hours he could work, such restrictions lasting for a period of more than two weeks. *See* Miller Depo., 41:12–42:18. During that period, Miller worked out an arrangement with his supervisor, Tony Elizondo, whereby Miller would be permitted to "sit down occasionally for short periods of time" when he was in "extreme pain." Miller Decl., ¶ 5. It is Elizondo's testimony that after Miller's return to work, he observed Miller limping and sitting down towards the end of his shift, *see* Deposition of Tony Elizondo ("Elizondo Depo."), 25:1–26:17, and that he asked Miller why he was doing so, "because it's not normal to sit down during the actual shift," *id.*, 27:9–28:25. Elizondo testifies that he felt Miller was able to perform his job functions during that period, albeit with pain symptoms, but that if he had understood that the need to sit periodically during the shift would be a "regular occurrence" or "serious to the point where it was normal" he would have reported the situation to UPS human resources, *id.*, 29:1–12, 30:20–31:3, because he did not believe "someone who needed to sit down, even briefly, in a given two-hour period" on a regular basis would be able to perform "the essential job functions" of the full-time hub supervisor position, *id.*, 82:21–84:10, *see also id.*, 85:1–14, 100:1–101:2, 102:23–103:2. In the short term, Elizondo testifies, his primary concern was for Miller's well-being, and that in the absence of advice that Miller's need to sit would become "consistent," he did not feel the need to report the situation to human resources, *Id.*, 85:1–86:11. Although Miller eventually returned to full-time work in

his position as hub supervisor, he testifies that he does not believe he ever became able to work an entire shift without sitting down, and indeed that he developed the proactive strategy of sitting whenever the opportunity arose, to avoid the circumstance where he might need to sit at an inopportune time. *See* Miller Depo., 75:18–76:1.

In August 2012, Miller consulted with his primary care physician, Dr. Kevin Grainger, regarding pain symptoms he was experiencing, *See id.*, 76:13–77:3. Miller underwent an MRI examination in an effort to rule out the lower-extremity blood clot as the cause of the pain symptoms, but the MRI established that the blood clot was in fact the cause. *See id.*, 77:5–12. Because Miller was already taking prescribed blood thinners, Grainger initially suggested that they simply observe the progress of the symptoms without taking further action, but two days later the pain symptoms had increased to the point at which Miller could not walk, and he reported to the emergency room, *See id.*, 77:13–78:12. Miller was hospitalized for a few days and then discharged, following which he returned to the emergency room with similar debilitating pain symptoms within a few days. *See id.*, 78:13–20. Miller was unable to walk without the use of a walker for a period of weeks. *See id.*, 80:6–23. Miller began an extended leave of absence from work at that time. *See id.*, 79:2–14.

In January 2013, Miller's employer-provided disability insurance carrier advised UPS that Miller should be able to return to work as of January 26, 2013, that as of that date he was expected to be "able to perform his essential job functions" with the "recommend[ation]" that he be subject to "a limitation of no more than 2 hours of continuous standing or walking [and] 30 minutes of seated activity" for "every 2 hours on his feet." Perini–Abbott Decl. I, Exh. 15 at 2. The carrier inquired whether UPS would accommodate the specified restrictions, to which UPS replied in the negative. *See id.* at 1. When Miller received UPS' negative response, he initiated an interactive reasonable accommodation process with UPS. *See* Miller Depo., 89:12–21, 93:6–17.

In pursuing the interactive process, Miller arranged for his physician, Dr. Grainger, to receive paperwork to fill out regarding his medical condition. *See id.* at 93:6–17. Grainger provided the completed paperwork to UPS, opining that Miller was "unable to perform all of the functions of his position due to limitation of standing and walking," indicating that Miller was "unable to stand or walk continuously for greater than 2 hours without a break of 1 hour," such limitation being expected to last "at least 6–12 months," but that Miller was "able to stand or walk as long as it is not continuous for >2 hours without a break" and "able to perform desk work / seated activity." Perini–Abbott Decl. I, Exh. 6 ("Request for Medical Information Form") at 2, 4.

On February 9, 2013, Miller applied successfully for long-term disability benefits. *See* Miller Depo., 85:23–86:20; Perini–Abbott Decl. I, Exh. 3 ("Long Term Disability Claim Form"). In connection with that application, Miller asserted to his employer-provided disability insurance earner that he was prevented from performing the duties of his job because in his job he was "required to be on [his] feet continuously for most of the day and [he] can't [be]." Long Term Disability Claim Form at 1. At his deposition, Miller testified with specific reference to that assertion that his statements in the Long Term Disability Claim Form were "truthful." Miller Depo., 86:11–20. Also in connection with the application, Miller submitted to the insurance carrier a description of his activities of daily living by and through which

he asserted that he was "[u]nable to walk or stand for extended periods of time due to swelling and pain in left leg." Declaration (# 37) of Perini–Abbott ("Perini–Abbott Decl. II"), Exh. 4 ("Activities of Daily Living Form") at 1. By and through his Activities of Daily Living Form, Miller advised his carrier that he had been taking blood thinners daily from July 2010 through the date of his application, and oxycodone three times daily from August 2012 through the date of his application. *See id.* He further indicated that, as of February 2013, he spent "most" of his day "seated with leg elevated" and that he continued to need to "sit and elevate [his] leg after being on [his] feet (standing/walking) for 2 hours or more," but that "[i]f [he] could do desk/seated work or use a scooter to drive around [he] could work." *Id.* at 3. He indicated that although he was at home all day his wife performed most housework. *See id.* at 4.

Miller testifies that, based on his understanding of what his physicians had explained to him about his medical condition, the accommodation he was seeking in February and March 2013 was to be permitted to perform "seated work for a half hour after being on [his] feet, standing or walking, for up to two hours continuously." Miller Depo., 93:18–94:6; *see also* Perini–Abbott Decl. I, Exh. 7 ("Accommodation Checklist dated March 7, 2013") at 1. Miller met with UPS human resources employee Johnson and UPS occupational health nurse Tricia Lorio on March 7, 2013, to discuss his request for accommodation, and indicated that "at th[at] time [he] would need to do seated work for at least 30 minutes for every 2 hours of continuous standing or walking." Accommodation Checklist dated March 7, 2013, at 2. Johnson discussed Miller's proposed accommodation at length with her supervisor and other UPS management and ultimately determined that UPS would be unable to ensure that Miller could be guaranteed

an opportunity to sit for half an hour for every two hours of continuous standing or walking while working in the full-time hub supervisor position. *See* Johnson Depo., 59:4 63:9, 81:15–83:4. UPS determined, however, that it would be able to accommodate Miller's limitations if he were able to work in a non-operations supervisory role, and in approximately April 2013 began searching for such positions for which Miller would be eligible and qualified. *See* Accommodation Checklist dated March 7, 2013, at 4; *see also* Johnson Depo., 97:23–98:4.

On June 27, 2013, Miller obtained a letter from vascular surgeon Gregory Moneta opining that Miller was at that time "able to be on his feet for one (1) hour before he is limited by pain and needs to elevate his feet. He can be assigned desk work so long as he is seated and not on his feet." Perini–Abbott Decl. I, Exh. 8. Miller believed that Moneta had erred in so opining, and called his offices to ask him to revise his letter. *See* Miller Decl., ¶ 10. After speaking with Miller, Moneta prepared a new letter, also dated June 27, 2013, stating that, at that time, Miller could "walk or stand and perform duties for 1–2 hours at a time. When needed, he needs to be seated for 15–30 minutes between these periods." Perini–Abbott Decl. I, Exh. 9. Miller never provided the first letter prepared by Dr. Moneta to UPS, but did provide UPS with the second letter prepared by Dr. Moneta in connection with a second effort to initiate an interactive reasonable accommodation process. *See* Miller Decl., ¶ 10; Perini–Abbott Decl. I, Exh. 10 ("Accommodation Checklist dated June 29, 2013"). In June 2013, Miller advised UPS human resources that the accommodation he was seeking was to be permitted to "sit after 1–2 hours of standing/walking for 15 to 30 minutes or use a PITO tug [*i.e.,* a motorized cart] when needed to get around or use a motorized scooter instead

of a PITO tug." Accommodation Checklist dated June 29, 2013, at 2. Again, Johnson discussed Miller's proposed accommodation with her supervisor and others at UPS, including as follows:

Q: Okay, so you mentioned there was a discussion about whether he could ride the scooter safely and what would happen if he needed to respond in case of an emergency. What was your part in the discussion about that?

A: My manager has never worked in the hub, so he was asking me more specific questions about my experience in the hub. ["]So, based off of your experience in the hub, do you think that he could safely ride the scooter around his area?["]

Q: And what did you say?

A: No.

Q: Why did you say that?

A: Because when the operation is running, there are other irreg trains moving throughout the building and there's equipment that the loaders use. So, in order for Tavis to ride the scooter he would have to go against the normal flow or path of the irreg trains that are in the building. So I thought that it would cause safety concerns for those individuals that have been accustomed to driving without someone miraculously coming at them on a scooter.

Johnson Depo. 61:12–62:8.

Again, UPS determined that it could not accommodate Miller's proposed accommodation in connection with the full-time hub supervisor position. See Accommodation Checklist dated June 29, 2013, at 4; Johnson Depo., 59:4–63:9, 81:15–83:4. Johnson continued monitoring available job positions for which Miller would be eligible and qualified. Johnson Depo., 127:12–21.

On September 24, 2013, Miller filed a BOLI complaint claiming disability discrimination, failure to accommodate, and wrongful termination. See Perini–Abbott Decl. I, Exh. 12.

Johnson periodically advised Miller of opportunities to apply for transfer to new positions at UPS, including a sales position for which Miller interviewed unsuccessfully. See Miller Depo., 103:11–105:4. Johnson and Miller discussed such possibilities once every few weeks during the period of his extended medical leave. See id.

In early January 2014, pursuant to its general policy of terminating employees after one year of leave, paperwork was generated for Miller's termination, but it appears to be undisputed that this was an administrative error, that Miller's termination was never actually effected, and that no UPS employee affirmatively made a decision to terminate Miller's employment. See id., 126:23–128:5.

Later in January 2014, Johnson identified a sedentary job position at UPS for which Miller would be qualified and eligible, and offered him the job. See Miller Depo., 106:22–107:11. Miller, accepted the job, which (after modification of the associated hourly wage) paid slightly more than his job as a full-time hub supervisor had done. See id., 107:12–108:22. In March or April 2014, Miller received an additional increase in his hourly rate of pay in the new position. See id. Miller is still working for UPS in that position.

On March 4, 2014, BOLI dismissed Miller's charge against UPS with a finding of insufficient evidence to continue its investigation. See Perini–Abbott Decl. I, Exh. 13. BOLI provided Miller with a right-to-sue letter. See id.

As of the date of his deposition, February 16, 2015, Miller testified that he continued to avoid standing and walking for

more than two hours without a break, that if he shopped at a mall he needed to plan around his need to have a sitting break, and that he remained unable to perform household chores all at once, but rather needed to break up his chores to accommodate his need for sitting breaks. *See* Miller Depo., 114:22–115:21. As of November 16, 2015, Miller testified that when his condition was "less symptomatic," he was able to "move well, so long as [he] s[a]t down at least once every one or two hours for a short period of time a little longer than a minute." Miller Decl., ¶ 2.

## ANALYSIS

As noted above, it is Miller's position that UPS violated the ADA (and the UDPD) by discriminating against him, including by failing to accommodate his disability and/or terminating his employment, and further violated the ADA (and the UDPD) by failing in good faith to engage in the interactive reasonable accommodation process. As a preliminary matter, I note that the UDPD "shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended by the federal ADA Amendments Act of 2008 and as otherwise amended." Or. Rev. Stat. 659A.139(1). The parties appear to be in tacit agreement that Miller's ADA and UDPD claims stand or fall together, and that the court need consider only the ADA (and case law construing the ADA) in deciding UPS' motion for summary judgment. Accordingly, I consider herein the merits of UPS' motion as though Miller's claims had been brought only under the ADA.

Title I of the ADA prohibits employment discrimination against persons with a disability:

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). A "covered entity" for ADA purposes is any employer with 15 or more employees. *See* 42 U.S.C. §§ 12111(2), 12111(5)(A).

For ADA purposes, "[t]he term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). For purposes of inquiry into an individual's qualification for a job, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* Moreover, the Equal Employment Opportunity Commission (the "EEOC") has promulgated an ADA-implementing regulation providing that a "qualified individual with a disability" is one "who satisfies the requisite skills, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

The EEOC has additionally promulgated an ADA-implementing regulation providing as follows:

*Essential functions—*

(1) *In general.* The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires. The term "essential functions" does not include

the marginal functions of the position.

(2) A job function may be considered essential for any of several reasons, including but not limited to the following:

(i) The function may be essential because the reason the position exists is to perform that function;

(ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or

(iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

(3) Evidence of whether a particular function is essential includes, but is not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n). By contrast with "essential functions," the EEOC defines "qualification standards" as follows: *"qualification standards* means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q).

For ADA purposes:

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1). Here, it is only actual disability as defined under Section 12102(1)(A) that is at issue. At least for present purposes, no party appears to dispute that Miller's deep vein thrombosis secondary to congenital absence of the inferior vena cava constitutes a disability under the ADA.

For ADA purposes, "discrimination" includes, in relevant or potentially relevant part:

(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

* * *

(3) utilizing standards, criteria, or methods of administration—

(A) that have the effect of discrimination on the basis of disability;

* * *

* * *

(5)

(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant; [or]

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity . . . .

42 U.S.C. § 12112(b).

For ADA purposes:

The term "reasonable accommodation" may include—

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreter's,

and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Finally, for ADA purposes:

(A) . . . The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

(B) Factors to be considered. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include—

(i) the nature and cost of the accommodation needed under this Act;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C. § 12111(10).

██ I consider first the merits of UPS' motion as it applies to Miller's dis-

ability discrimination claim(s). "To state a *prima facie* case [of disability discrimination in employment] under the ADA, a plaintiff must prove that he is a qualified individual with a disability who suffered an adverse employment action because of his disability." *Sanders v. Arneson Prods.*, 91 F.3d 1351, 1353 (9th Cir.1996). As indicated above, the requirement that an ADA disability discrimination plaintiff have suffered an adverse employment action may be satisfied by, *inter alia*, either the employer's failure to provide a reasonable accommodation where such an accommodation was available or by the employer's termination of the plaintiffs employment. *See* 42 U.S.C. § 12112(b)(1), (5). The employer's enforcement of qualification standards in a manner that has the effect of improperly discriminating against disabled employees can likewise satisfy the adverse employment action requirement. *See* 42 U.S.C. § 12112(b)(3), (6). Miller's claim is pled as arising out of UPS' failure to accommodate his disability to permit his return to work at some time between January 2013 and January 2014; in opposition to UPS' motion for summary judgment, Miller offers argument suggesting that it may be Miller's position that UPS' failure to provide accommodation occurred as a result of UPS' discriminatory enforcement of a qualification standard.

At the crux of the parties' dispute is the question whether the ability to stand and/or walk continuously without a significant break for the entirety of the 3.5 to 4.5 hour package-handler shift is an essential function of the hub supervisor position. While an ADA employment-discrimination plaintiff bears the burden of ultimately proving that he is qualified for the job position at issue, where the plaintiff's employer disputes the plaintiff's claim that he can perform the essential functions the employer bears the burden to produce evidence sufficient to establish what the essential functions are. *See Samper v. Prov-*

*idence St., Vincent Med, Ctr.*, 675 F.3d 1233, 1237 (9th Cir.2012).

UPS takes the position that such continuous standing and/or walking is an essential function of Miller's former job, supporting its position by reference to the seven EEOC-promulgated factors for determining whether a given job function is "essential" for ADA purposes codified at 20 C.F.R. § 1630.2(n)(3). As Miller correctly notes, however, UPS' reliance on the Section 1630.2(n)(3) factors is untenable in light of the provisions of 20 C.F.R. § 1630.2(n)(1) and (2), which establish that the term "essential functions" refers to the "fundamental job duties" of an employment position, which is to say either the functions the performance of which is the reason the position exists, functions that can only be performed by a limited number of employees, or functions requiring such a degree of specialization that to be hired for the position requires expertise in that specialty. *See* 20 C.F.R. § 1630.2(n)(1), (2). Nothing in the evidentiary record—specifically including the Essential Job Functions Document, the testimony of Evans, Celorie, and Hoon, the testimony of Elizondo, and Miller's statements made by and through the Long Term Disability Claim Form—has any tendency to establish that continuous standing and/or walking for a period of up to 4.5 hours is one of the fundamental job duties of the hub supervisor position, that the hub supervisor position exists in order to ensure that an employee will continuously stand and/or walk on UPS' behalf during the package handlers' shift, that UPS only has a limited number of employees capable of providing continuous standing and/or walking services, or that continuous standing and/or walking requires specialized expertise. To the contrary, UPS' evidentiary proffer has a tendency to establish that such continuous standing and/or walking is at most a physical attribute that, in the

absence of some form of accommodation, would be necessary for the performance of certain of the job duties of the hub supervisor position (namely, ensuring that package handlers are performing their jobs correctly and efficiently, demonstrating proper loading, unloading, and sorting techniques, trouble-shooting problems with the package-sort procedure over the entirety of the hub, and filling in for package handlers as needed, see Job Description Document). See. e.g., Bates v. UPS, 511 F.3d 974, 990 (9th Cir.2007) (" 'Essential functions' are not to be confused with 'qualification standards,' which an employer may establish for a certain position. Whereas 'essential functions' are basic 'duties,' 29 C.F.R. § 1630.2(n)(1), 'qualification standards' are 'personal and professional attributes' that may include 'physical, medical and safety' requirements. Id. § 1630.2(q), The difference is crucial."). I therefore find on the basis of the current evidentiary record that UPS has not met its burden to establish that the ability to stand and/or walk continuously without a significant break for the entirety of the 3.5 to 4.5 hour package-handler shift is an essential function of the hub supervisor job.[2] See id. at 991. Indeed, the current evidentiary record suggests instead that such ability to stand and/or walk continuously is, at most, a qualification standard and not an essential function of Miller's former job. See 29 C.F.R. § 1630.2(n)(1), (2).

At oral argument in connection with UPS' motion, counsel for UPS asserted to the court that in the event that the court disagreed with UPS that continuous standing and/or walking was as a matter of law an essential function of the hub supervisor position, questions of fact would necessarily preclude grant of summary judgment in defendant's favor as to Miller's discrimination claim (although, counsel asserted, UPS would continue to argue that it was entitled to summary judgment as to Miller's claim of failure to engage in the reasonable accommodation process). While I nevertheless do not find that my conclusion that continuous standing and/or walking was not an essential function of the job would necessarily preclude summary judgment without regard to the content of the evidentiary record, I do agree, for the reasons that follow, that given the current state of the record UPS is not entitled to summary judgment as to Miller's claim(s) to the extent premised on disability discrimination.

In support of that conclusion, I note, first, that there is a degree of ambiguity in the restrictions recommended by Miller's physicians and the accommodations requested by Miller in connection with his proposed return to work from his second medical leave. In early January, Miller's

---

2. Moreover, I note that UPS has made no express effort to establish the fundamental job duties of the hub supervisor position other than the purported "duty" of continuous standing and/or walking. Under Samper, supra, this is arguably sufficient to defeat UPS' motion to the extent it addresses Miller's employment discrimination claim(s). However, because the evidentiary record contains the Job Description Document and because UPS offered into evidence the testimony of Elizondo, Evans, Celorie, and Hoon which, if believed by a trier of fact, would tend to support the conclusion that the capacity for continu-

ous standing and/or walking, absent an accommodation, is necessary in order to fulfill hub supervisor job duties including ensuring that package handlers are performing their jobs correctly and efficiently, demonstrating proper loading, unloading, and sorting techniques, trouble-shooting problems with the package-sort procedure over the entirety of the hub, and filling in for package handlers as needed, I assume arguendo and only for purposes of UPS' motion for summary judgment that those duties are among the essential functions of the job.

disability insurance carrier advised UPS that it expected Miller to be able to return to work as of January 26, 2013, with the "recommend[ation]" that he be subject to "a limitation of no more than 2 hours of *continuous* standing or walking [and] 30 minutes of seated activity" for "every 2 hours on his feet." Perini–Abbott Decl. I, Exh, 15 at 2 (emphasis supplied). In connection with the interactive process Miller initiated in January 2013, his physician Grainger opined that Miller was "unable to stand or walk *continuously* for greater than 2 hours without a break of 1 hour" but was "able to stand or walk as long as it is not *continuous* for >2 hours without a break." Request for Medical Information Form at 2, 4 (emphasis supplied). In connection with the interactive process initiated in February 2013, Miller indicated to UPS human resources personnel that he "would need to do seated work for at least 30 minutes for every 2 hours of *continuous* standing or walking." Accommodation Checklist dated March 7, 2013, at 2 (emphasis supplied). Miller later testified that in February and March 2013 the accommodation he was seeking from UPS was to be permitted to perform "seated work for a half hour after being on [his] feet, standing or walking, for up to two hours *continuously*." Miller Depo., 93:18–94:6 (emphasis supplied). On June 27, 2013, Miller provided UPS with a letter from his physician Moneta indicating that he could "walk or stand and perform duties for 1–2 hours at a time ... [and] needed ... to be seated for 15–30 minutes between th[o]se periods." Perini–Abbott Decl. I, Exh. 9. In connection with the interactive process initiated in June 2013, Miller advised UPS human resources that the accommodation he was seeking was to be permitted to "sit after 1–2 hours of standing/walking for 15 to 30 minutes or use a PITO tug when needed to get around or use a motorized scooter instead of a PITO tug." Accommodation Checklist dated June 29, 2013, at

2. Relying heavily on the modifier "continuous" which appears in all of the restrictions and requests from prior to June 2013, Miller currently takes the position that his physician-recommended restrictions and his accommodation requests would have permitted him to perform all of his job duties as a hub supervisor in a satisfactory manner without incurring any medical risk so long as he were able to sit or lean for a brief period of a few minutes during any one- to two-hour period of *otherwise* "continuous" standing and/or walking; UPS takes the position that the restrictions and requests cannot reasonably be so interpreted, and that it would be affirmatively unreasonable to interpret them as contemplating unlimited upright activity with only minimal breaks, I agree with UPS that it is highly implausible that Miller's physicians believed that Miller's need for a break on the order of either 30 minutes following a period of 1–2 hours of continuous upright activity could be entirely avoided by the simple expedient of always breaking the continuity of the upright activity by leaning or sitting for only a few minutes. However, at this stage of these proceedings, interpreting the evidence of record in the light most favorable to Miller, I acknowledge that Miller's position is consistent with the plain language of the restrictions and the requested accommodations, and I do not find that the precise meaning and effect of the restrictions can be determined on the basis of the current record.

■ As noted above, in early 2013 Miller initiated an interactive process with UPS human resources in connection with which he expressly requested the accommodation of being permitted to perform "seated work for a half hour after being on [his] feet, standing or walking, for up to two hours continuously." Miller Depo., 93:18–94:6; *see also* Perini–Abbott Decl. I,

Exh. 7 ("Accommodation Checklist dated March 7, 2013") at 1. On the *arguendo* assumption (discussed *supra)* that the essential functions of the hub supervisor job included ensuring that package handlers are performing their jobs correctly and efficiently, demonstrating proper loading, unloading, and sorting techniques, troubleshooting problems with the package-sort procedure over the entirety of the hub, and filling in for package handlers as needed, I agree with UPS that the accommodation specifically requested in January to March 2013 would not have permitted Miller reliably to perform all of the essential functions of the job. However, once a disabled employee has given an employer "notification of [his] disability and the desire for accommodation," *Vinson v. Thomas,* 288 F.3d 1145, 1154 (9th Cir.2002), *citing Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1114 (9th Cir.2000) (*en banc* ), "there is a mandatory obligation to engage in an informal interactive process 'to clarify what the individual needs and identify the appropriate accommodation.'" *Id., quoting Barnett,* 228 F.3d at 1112. Such interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). Moreover, "[t]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees...." *Humphrey v. Mem'l Hosps. Ass'n,* 239 F.3d 1128, 1137 (9th Cir.2001) (citations omitted). If a reasonable accommodation that would permit Miller to perform the essential functions of his job existed, UPS was not entitled to rest on its rejection of Miller's proposed accommodation, but rather was under an obligation to identify and consider other possible accommodations.

■ Also as noted above, in June 2013 Miller initiated a second interactive process in connection with which he expressly requested the accommodation of being permitted to "sit after 1–2 hours of standing/walking for 15 to 30 minutes or use a PITO tug when needed to get around or use a motorized scooter instead of a PITO tug." Accommodation Checklist dated June 29, 2013, at 2. The record contains sufficient evidence to establish that UPS rejected this proposed accommodation, and further contains sufficient evidence to establish that UPS human resources and management considered the possibility that the proposed accommodation of being permitted to get around the hub on a motorized cart or scooter might raise significant safety concerns, but does not contain sufficient evidence—particularly at this stage of these proceedings, at which the evidence of record must be viewed in the light most favorable to Miller—to permit the conclusion that UPS rejected the proposed accommodation on the basis of those safety concerns or that, if it did so, those safety concerns rose to the level of "undue hardship" as defined at Section 12111(10). Indeed, in support of its motion for summary judgment, UPS does not argue that it rejected the proposed motorized cart or scooter accommodation on the basis of safety concerns or otherwise on the basis of undue hardship, but rather argues that it was not required to consider that proposed accommodation because to grant it would be tantamount to changing the essential functions of the position by granting an exemption from one of those functions (namely, continuous standing and/or walking for 3.5 to 4.5 hours), which an employer is not obligated to do under the ADA. Because this argument necessarily depends on the invalid premise that such continuous standing and/or walking was an essential function of the hub supervisor position, it cannot operate to establish UPS' entitlement to summary judgment.

Naturally, I find neither that permission to get around the hub during the package-handlers' shift on a motorized cart or scooter would have been a reasonable accommodation of Miller's disability nor that it is likely that such an accommodation would have been reasonable. It is entirely possible and even plausible that due to safety concerns or other undue hardship it would not have been feasible for UPS to offer such an accommodation. However, on the current evidentiary record, UPS has not established either that permission to get around the hub during the package-handlers' shift on a motorized cart or scooter would not have allowed Miller to perform the essential functions of his job or that undue hardship would have prevented UPS from offering such an accommodation. In consequence, on the current evidentiary record UPS is not entitled to summary judgment as to Miller's employment discrimination claim(s).

I turn now to the merits of UPS' motion as it applies to Miller's claim(s) of failure to participate in good faith in the interactive reasonable accommodation process. As noted above, once a disabled employee has given an employer "notification of [his] disability and the desire for accommodation," *Vinson*, 288 F.3d at 1154, "there is a mandatory obligation to engage in an informal interactive process to clarify what the individual needs and identify the appropriate accommodation." *Id.* (quotation marks omitted). Such interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3). Moreover, "[t]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir.2001) (citations omit-

ted). "Employers . . . who fail to engage in the interactive process in good faith . . . face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Id., citing Barnett*, 228 F.3d at 1116.

For the same reasons discussed above, it is not possible on the current evidentiary record to reach the reasonable conclusion that no reasonable accommodation existed that would have permitted Miller to perform the essential functions of his job notwithstanding his disability. Because it cannot be determined on this record at this stage of these proceedings that no reasonable accommodation would have been possible, UPS can only prevail on its motion to the extent it addresses Miller's failure-to-engage claim(s) by establishing that its participation in the two interactive processes Miller initiated was in good faith. In support of that proposition, UPS notes that it twice initiated formal inquiries into the reasonableness of Miller's requested accommodations of his disability, each time meeting with him to determine his precise limitations and thereafter engaging in an investigation and a deliberative process to determine whether the requested accommodations were feasible. UPS takes the position that this satisfied its obligations to engage in the interactive process, Miller counters that there is necessarily a question of fact as to whether UPS' engagement in the interactive process was in good faith, noting that UPS never gave express consideration to any accommodation that would have permitted him to perform his job duties during any significant portion of the sorting process from a sedentary position, and that UPS failed to propose potential accommodations other than those expressly proposed by Miller.

Questions regarding a party's good faith are in general reserved for the finder

of fact, *see, e.g., Poole v. Centennial Imps., Inc.,* Case No. 2:12–CV–00647–APG–VCF, 2014 WL 2090810, *6–7, 2014 U.S. Dist. LEXIS 69176, *21 (D.Nev. May 19, 2014), and this case does not raise the unusual scenario under which the question of the employer's good faith can be resolved at summary judgment. To the contrary, viewing the evidence in the light most favorable to Miller, a finder of fact could reasonably conclude that UPS did not engage in the interactive process in good faith. In consequence, UPS has not established its entitlement to summary judgment in connection with Miller's failure-to-engage claim(s).

## CONCLUSION

For the reasons set forth above, UPS' motion (# 23) for summary judgment should be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.